KEYSTONE BITUMINOUS COAL ASSO-
CIATION, Helvetia Coal Company,
Rochester and Pittsburgh Coal Compa-
ny, U.S. Steel Mining Company, Inc.,
United States Steel Corporation and
Consolidation Coal Company, Plain-
tiffs,

v.

Nicholas DeBENEDICTIS, Philip Zullo
and Thomas B. Alexander,
Defendants.

Civ. A. No. 82–2712.

United States District Court,
W.D. Pennsylvania.

Feb. 29, 1984.

512

Thomas Reed, Henry McC. Ingram, David Onuscheck, Pittsburgh, Pa., for plaintiffs.

Douglas R. Blazey, Pa. Dept. of Environmental Resources, Robert B. Hoffman, Deputy Atty. Gen., Harrisburg, Pa., for defendants.

## OPINION

ZIEGLER, District Judge.

More than 60 years have passed since the Supreme Court announced its landmark decision in *Pennsylvania Coal Company v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922). Speaking for the majority, Justice Holmes explained that the police power of government has a limit and action beyond that limit results in a "taking" of private property for which just compensation is required. The Court declared unconstitutional a Pennsylvania statute that prohibited coal mining that caused subsidence damage to surface lands.

In this case we are faced with a constitutional challenge to another Pennsylvania statute which seeks to prevent coal mining subsidence damage. However, the statute here differs from the enactment in *Pennsylvania Coal;* the parties are different; and, most importantly, the passage of time and subsequent decisions require that *Pennsylvania Coal* be placed in proper perspective.

In the present case, defendants, who are state officials charged with enforcing the

act, maintain that the statute is a valid exercise of Pennsylvania's inherent police power to regulate private industry for the public health, safety and welfare. Plaintiffs argue that the statute goes beyond police power and appropriates private property for public use in violation of the Takings Clause of the Fourteenth Amendment. Thus we are presented with a classic confrontation between private property interests and public powers of regulation since the opposing interests are well-defined and nearly perfectly equal in magnitude.

Because plaintiffs have not alleged any injury due to the enforcement of the statute, there is as yet no concrete controversy regarding the application of the specific provisions and regulations. Thus, the only question before this court is whether the mere enactment of the statute and regulations constitutes a taking. *Agins v. City of Tiburon,* 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980). For the reasons that follow, we hold that the Pennsylvania legislation and regulations do not exceed the inherent police power of the state as defined by *Pennsylvania Coal* and its progeny. Plaintiffs' motion for summary judgment must be denied and defendants' motion for judgment must be granted.

## I. *History of Case*

Five coal companies and an association representing similar interests instituted this civil action challenging the constitutionality of three sections of Pennsylvania's Bituminous Mine Subsidence and Land Conservation Act, 52 P.S.A. § 1406.1 *et seq,* and three regulations of the Pennsylvania Department of Environmental Resources (DER) adopted under the act. Plaintiffs seek an injunction to prevent enforcement of these provisions by the DER officials.

The challenged provisions are as follows:

(1) Section 1406.4, which prohibits mining that causes subsidence damage to certain surface structures in place as of April 27, 1966, namely, any publicly-used building, residential building or cemetery.

(2) Section 1406.6, which gives the DER authority to revoke a mining permit if a company fails to pay a reasonable sum to repair subsidence damage to the structures listed in § 1406.4.

(3) Section 1406.15, which allows the owner of a structure not listed in § 1406.4 to pay a reasonable price to purchase from the coal company the underlying coal that supports the structure. This section provides for arbitration or mediation if the parties fail to agree upon a reasonable price.

(4) DER Regulation 89.145, which expands the protected structures of § 1406.4 to include: perennial streams and large impoundments of water, aquifers that serve as a significant source of public water supply, and coal refuse disposal areas. This regulation also prohibits mining under urban areas.

(5) DER Regulation 89.146, which requires coal operators to leave 50 percent of their coal in place for support under structures and features protected under § 1406.4 and DER Regulation 89.145.

(6) DER Regulation 89.147(b), which provides that, when underground mining activities reduce the value or foreseeable uses of surface land, the operator shall restore the land to its premining condition.

Plaintiffs contend that § 1406.4 and DER Regulations 89.145 and 89.146 violate (a) the Due Process Clause of the Fourteenth Amendment in that property is taken without just compensation and (b) the Contract Clause of the United States Constitution, Article I, Section 10, in that the regulations destroy private contract rights. Plaintiffs also argue that § 1406.6 and DER Regulation 89.147(b) impair private contracts in contravention of the Contract Clause. Finally, plaintiffs urge that § 1406.15 is an unconstitutional exercise of the power of eminent domain because the taking is without a public purpose.

## II. *The Contract Clause*

Article I, Section 10 of the Constitution provides that: "No State shall … pass any … Law impairing the Obligation of Contracts…." Although the language of the Contract Clause appears to be abso-

lute, its prohibition must accommodate the inherent police power of a state "to safeguard the vital interests of its people." *Home Building & Loan Association v. Blaisdell*, 290 U.S. 398, 434, 54 S.Ct. 231, 238, 78 L.Ed. 413 (1934); *Energy Reserves Group v. Kansas Power & Light,* — U.S. ——, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983). Any regulation promulgated by a state under its legitimate police powers does not violate the Contract Clause if the enactment serves a legitimate public purpose and does not simply provide a benefit to special interests. *Energy Reserves Group*, 103 S.Ct. at 705.

■ Courts generally will defer to a legislative determination of public purpose in testing legislation under the Contract Clause, except when the state enacts legislation to avoid its contractual obligations. Thus, when the state is a party to a contract, the Contract Clause is given a more absolute, literal meaning because "complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake." *United States Trust Company v. New Jersey*, 431 U.S. 1, 26, 97 S.Ct. 1505, 1519, 52 L.Ed.2d 92 (1977). Where the state is *not* a contracting party, "[a]s is customary in reviewing economic and social regulation, ... courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *Energy Reserves Group*, 103 S.Ct. at 705–06.

Justice Blackmun, speaking for a unanimous Court in *Energy Reserves Group*, wrote that economic and social legislation is to be analyzed under the Contract Clause through a three-step test. 103 S.Ct. at 704–05. That test was recently applied by the Court of Appeals in *Troy, Ltd. v. Renna*, 727 F.2d 287 (3d Cir. Jan. 30, 1984), as Judge Gibbons explained:

The threshold inquiry is whether the state law has operated "as a substantial impairment of a contractual relationship ...." If the state law is found to be a substantial impairment, then a second inquiry is required: "the State, in justification, must have a significant and legitimate public purpose behind the regulation ... such as the remedying of a broad and general social or economic problem...." Finally, if such a legitimate public purpose is identified, a third query is posed: the next inquiry is whether the adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption.

At 297.

Plaintiffs do not allege that the legislation and DER regulations under attack impair any contract to which the Commonwealth is a party. Therefore, we need only apply a lower level of scrutiny under the Contract Clause using the three-step test.

It is not disputed that plaintiffs have established the threshold requirement that the laws in question operate to substantially impair a contractual relationship. The parties have stipulated that landowners in Western Pennsylvania have conveyed title to the coal and the right of surface support to plaintiffs, while retaining ownership of the surface estate, and that approximately 90 percent of the coal now being mined and to be mined by plaintiffs was purchased by severing the coal and support estates from the surface estates.[1] It is clear that the owners of the surface estates or their predecessors in title contracted away their right to support of the surface and that the legislation and regulations in question seek to guarantee support of the surface despite these contractual relationships. We find that plaintiffs have satisfied the first prong of the test of *Energy Reserves Group*.

We next find that the Commonwealth has a significant and legitimate public purpose behind the regulations. In applying this factor, we must give deference to the

**1.** Pennsylvania recognizes three types of estates in land—the surface, the coal and the right of support—and each of these may be vested in different persons at the same time. *Smith v. Glen Alden Coal Company*, 347 Pa. 290, 32 A.2d 227 (1943).

public purpose expressed by the legislature. The General Assembly of Pennsylvania has made extensive legislative findings to support a legitimate public purpose. The legislature determined that the Bituminous Mine Subsidence and Land Conservation Act was necessary because mine subsidence impedes land development, erodes the tax base of affected municipalities and causes "a very clear and present danger to the health, safety and welfare of the people of Pennsylvania." *See* 52 P.S.A. § 1406.3 (Purdon's 1983).

█ Finally, we find that the legislation and regulations in question, which adjust the rights and responsibilities of the contracting parties, are reasonably related to the public purpose to be served. The General Assembly has identified important state interests in preserving the integrity of surface structures and features. Its interest is to prevent subsidence damage, not to provide remedies after damage has been incurred. The legislation and regulations specify only those surface structures and features in which the Commonwealth has a legitimate interest. Thus, the act and the regulations promulgated under it are tailored to serve the expressed public purpose of the legislature.

Applying the teachings of *Energy Reserves Group,* we conclude that the incidental adjustment of the private contractual relationships at bar do not render the legislation unconstitutional under the Contract Clause. We further hold that §§ 1406.4 and 1406.6 and DER Regulations 89.145, 89.146 and 89.147(b) are not unconstitutional under the Contract Clause.

### III. *Police Power and Takings*

Plaintiffs next argue that § 1406.4 and DER Regulations 89.145 and 89.146 constitute a taking of property without just compensation in violation of the Due Process Clause of the Fourteenth Amendment. Plaintiffs maintain that the legislation and regulations destroy an estate in land, that is, the support estate which they purchased and severed from the surface estate. Because Pennsylvania recognizes the support estate as a separate estate in land, according to plaintiffs, any regulation that requires coal mine owners to maintain support estates to prevent subsidence damage to the surface estate represents an uncompensated "taking" of the support estate. To buttress this argument, plaintiffs cite *Pennsylvania Coal Company v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922).

### A. *The Pennsylvania Coal Company Case*

In 1921, the Pennsylvania General Assembly enacted Act 445, P.L. 1198, commonly referred to as the Kohler Act, declaring unlawful the mining of anthracite coal that caused subsidence damage to any public building, passageway, public utility, residential structure or cemetery. The Mahons owned the surface land on which their residence was located, and Pennsylvania Coal Company owned the coal underlying the surface estate. The Mahons' predecessor in title purchased the surface estate from Pennsylvania Coal, which reserved to itself the mineral and support estates to the property. The Mahons, trying to prevent the cave-in and collapse of their house, sought enforcement of the Kohler Act to stop Pennsylvania Coal from mining under their property. The company argued that the Kohler Act was unconstitutional because it protected the rights of a small group of private parties, rather than the public interest.

The Supreme Court agreed. Justice Holmes, writing for the majority, explained that regulation may go so far as to constitute a "taking" of private property for which just compensation is required. Justice Brandeis, in a much-quoted dissent, concluded that a restriction imposed to protect the public health, safety or morals from threatened dangers is not a taking.

Because the instant case is factually similar to *Pennsylvania Coal,* our fidelity to the common law tradition requires that we ascertain its true holding. To do so, we must examine the Kohler Act and its perceived deficiencies. Justice Holmes criticized three aspects of the law: (a) it was

not justified as a protection of public safety; (b) it was not directed to preventing common or public damage; and (c) it did not apply to all surface owners because any coal companies, owning the surface estate as well as the mineral and support estates, were exempted from the act.

The Bituminous Mine Subsidence and Land Conservation Act overcomes all three criticisms; it is justified as a public safety measure;[2] it seeks to prevent common or public damage;[3] and no surface estate owner is excluded from the act.

It is also worth noting that much of the opinion in *Pennsylvania Coal* is cast in terms of government's power to enact legislation affecting private affairs. But Justice Holmes narrowed the holding when he wrote: "This is the case of a single private house. . . . [U]sually in ordinary private affairs the public interest does not warrant much of this kind of interference. A source of damage to such a house is not a public nuisance even if similar damage is inflicted on others in different places. The damage is not common or public." 260 U.S. at 413, 43 S.Ct. at 159. Clearly, the case did not involve the interests of the coal industry in underground mining against a generally broad public interest in the integrity of surface structures and features. Indeed, Holmes's opinion can be closely tied to *Pennsylvania Coal's* argument that the "Kohler Act is not directed to the safety of the public, but is for the benefit solely of a particular class." 260 U.S. at 399, 43 S.Ct. 158.[4]

2. The public purpose is contained in § 1406.3 of the act:

It is hereby determined by the General Assembly of Pennsylvania and declared as a matter of legislative findings that:
(1) Present mine subsidence legislation and coal mining laws have failed to protect the public interest in Pennsylvania in preserving our land.
(2) Damage from mine subsidence has seriously impeded land development of the Commonwealth.
(3) Damage from mine subsidence has caused a very clear and present danger to the health, safety and welfare of the people of Pennsylvania.
(4) Damage by subsidence erodes the tax base of the affected municipalities.
(5) Coal and related industries and their continued operation are important to the economic welfare and growth of the Commonwealth.
(6) In the past, owners of surface structures have not in many instances received adequate notice or knowledge regarding subsurface support, or lack thereof, for surface structures, and therefore the State must exercise its police powers for the protection of the structures covered herein.
(7) In order to prevent the occurrence of such state of affairs in the future, the deed notice provisions relating to such subsurface support, or lack thereof to a person desiring to erect a surface structure after the effective date of this act, must be emphasized and strengthened and it is necessary to make available to those persons desiring to erect a surface structure procedures whereby adequate support of such structure can be acquired.
The Pennsylvania General Assembly therefore declares it to be the policy of the Commonwealth of Pennsylvania that:

(1) The protection of surface structures and better land utilization are of utmost importance to Pennsylvania.
(2) Damage to surface structures and the land supporting them caused by mine subsidence is against the public interest and may adversely affect the health, safety and welfare of our citizens.
(3) The prevention of damage from mine subsidence is recognized as being related to the economic future and well-being of Pennsylvania.
(4) The preservation within the Commonwealth of surface structures and the land supporting them is necessary for the safety and welfare of the people.
(5) It is the intent of this act to harmonize the protection of surface structures and the land supporting them and the continued growth and development of the bituminous coal industry in the Commonwealth.
(6) It is necessary to provide for the protection of those presently existing structures which are or may be damaged due to mine subsidence.
(7) It is necessary to provide a method whereby surface structures erected after the effective date of this act may be protected from damage arising from mine subsidence.

3. *See* 52 P.S.A. § 1406.2, which states the purpose of the act.

4. *See also* McGinley, Barrett, *Pennsylvania Coal Company v. Machon Revisited*, 16 Tulsa L.J. 418, 451–52 (1981):

*Pennsylvania Coal* was not a case in which legislation was enacted to serve an important public interest. Rather, the statute struck down by the Court was directed at protecting private interests. . . . The fifth amendment was never intended to recognize or to secure vested property rights in those whose private

In the instant case, this court is called upon to determine the constitutionality of a statute whose expressed purpose is to protect the public health, safety and welfare. Therefore, *Pennsylvania Coal* is distinguishable and we must canvass the decisions of the Supreme Court concerning police power and "takings" for guidance.

### B. *Police Power and Takings*

One precept from *Pennsylvania Coal* that retains as much vitality today as it did in 1922 is that, while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking. Unfortunately, the Supreme Court has not drawn a bright line between police power and taking. As the Court stated in *Penn Central Transportation Company v. City of New York*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978):

> [T]his Court, quite simply, has been unable to develop any "set formula" for determining when "justice and fairness" require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons.

■ As a result, the question whether a particular governmental restriction amounts to a constitutional taking turns upon the particular circumstances of each case. *United States v. Central Eureka Mining Company*, 357 U.S. 155, 78 S.Ct. 1097, 2 L.Ed.2d 1228 (1958). In the absence of a "set formula," taking questions must be answered by analogizing Fourteenth Amendment decisions. To aid in the present case, we will consider four recent Supreme Court decisions.

In *Penn Central Transportation Company, supra,* the owner of an historic structure challenged as a taking a landmark's preservation law which prohibited exterior alterations of the building. The Court held that such a regulation was not a taking, although the regulation significantly impaired investment-backed expectations. The regulation was upheld because

activities harm important *public* interests.

it was reasonably related to the promotion of the general welfare. In *Loretto v. Teleprompter Manhattan CATV Corporation,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed. 868 (1982), a New York statute provided that a landlord must permit a cable television company to install cable facilities on his property and may not demand payment from the company in excess of $1. The Court found a taking and held that the permanent physical occupation of real property is a taking, without regard to whether the occupation achieves an important public benefit. In *Andrus v. Allard,* 444 U.S. 51, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979), an owner of bald eagle parts challenged as a taking a federal law forbidding the sale of such parts. The Court concluded that the law did not amount to a taking because the owner retained some rights in the property—the right to possess and transport the parts. In *Kaiser Aetna v. United States,* 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979), the owner of a lagoon in Hawaii converted the pond to a marina by connecting it to the bay. The federal government claimed that the lagoon then became subject to a "navigational servitude" because it became part of the navigational waterways. The Court found a taking because the servitude resulted in a physical invasion of the privately owned marina. The government, therefore, was required to pay just compensation.

■ A careful reading of these holdings reveals the following rules governing takings: (1) any permanent physical occupation of the land by the government constitutes a taking, *Loretto, supra,* 458 U.S. at 427, 102 S.Ct. at 3172; (2) if the government creates an easement for public use in private property, there is a physical invasion and a taking, *Kaiser Aetna, supra* 444 U.S. at 180, 100 S.Ct. at 393; (3) land-use regulations that destroy or adversely affect recognized real property interests can be upheld if the state legislature reasonably concludes that the health, safety, morals or general welfare would be promoted by prohibiting contemplated uses of land, *Penn Central Transportation Company, supra,*

(Emphasis added.)

438 U.S. at 125, 98 S.Ct. at 2659, and (4) for a land-use regulation to constitute a taking, where no physical invasion by the government is present, the regulation must destroy the owner's entire "bundle" of property rights, *Andrus, supra,* 444 U.S. at 66, 100 S.Ct. at 327.[5]

Applying these rules, we conclude that the Bituminous Mine Subsidence and Land Conservation Act does not constitute a taking and is a legitimate exercise of the Commonwealth's police power. First, the statute and DER regulations do not result in a permanent, or even temporary, physical occupation of plaintiffs' real property. Plaintiffs retain title and possession of the mineral and support estates. The restrictions merely deal with plaintiffs' use of their properties to prevent harm to the public generally. Second, the statute and regulations do not vest in the public generally any right to an easement or other servitude in the mineral or support estates. And third, the restrictions can be upheld on the basis that the Commonwealth has determined that the health, safety and general welfare of the public are promoted by restricting such uses of land.

### C. *The Support Estate*

Plaintiffs' final argument, that is, the restrictions constitute a taking because they destroy a recognized property right in Pennsylvania—the support estate, must be considered. Here we again turn to *Andrus v. Allard,* 444 U.S. at 66, 100 S.Ct. at 327. The Court declared:

> [T]he denial of one traditional property right does not always amount to a taking. At least where an owner possesses a full "bundle" of property rights, the destruction of one "strand" of the bundle is not a taking, because the aggregate must be viewed in its entirety .... It is, to be sure, undeniable that the regulations here prevent the most profitable use of appellees' property. Again, however, that is not dispositive. When we review regulation, a reduction in the value of property is not necessarily equated with a taking.

In *Andrus,* the Eagle Protection Act destroyed the most profitable "strand" of property rights, the right to sell bald eagle parts. However, the entire "bundle" of rights was not destroyed because the appellees could continue to possess, transport and publicly display their property. In the present case, plaintiffs argue that the legislation and regulations entirely destroy their support estate. Implicit in this argument is the assumption that the support estate

**5.** Several commentators have advanced differing theories on when a government regulation exceeds police power authority and results in a taking. Sax, *Takings and the Police Power,* 74 Yale L.J. 36, 62–63 (1964):

> This analysis rests upon the distinction between the role of government as participant and the government as mediator in the process of competition among economic claims. The losses to individual property owners arising from government activity of the first type result in a benefit to a government enterprise; losses arising from the second type of activity are the result of government mediating conflicts between competing private economic claims and produces no benefit to any government enterprise....
>
> The rule proposed here is that when economic loss is incurred as a result of government enhancement of its resource position in its enterprise capacity, then compensation is constitutionally required; it is that result which is to be characterized as a taking. But losses, however severe, incurred as a consequence of government acting merely in its arbitrary ca-

pacity are to be viewed as a non-compensable exercise of the public power.

In Dunham, *A Legal and Economic Basis for City Planning,* 58 Colum.L.Rev. 650 (1958), the author discusses taking in terms of the government's motive in enacting the land-use restriction. If the restriction is intended to prevent harmful conduct of a property owner, government is acting within its police power. However, if government is attempting to usurp a benefit by its use of private property, there is a taking for which just compensation is required. And in Michelman, *Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law,* 80 Harv.L.Rev. 1165 (1967), the writer criticizes the tests proposed by Sax and Dunham, finding no meaningful distinction between a regulation that seeks to prevent harm and one that results in an economic benefit to the government. Michelman suggests that a need for compensation arises when property is capriciously redistributed and the regulation operates in an unfair and discriminatory fashion.

"bundle" of rights consists of only one "strand"—the right to cause subsidence damage to the surface estate. State law must be consulted therefore to determine whether the support estate "bundle" contains any other "strands."

Property interests are created by state law. A plaintiff claiming a due process violation, "while relying upon state law to establish his property right, looks to federal law to define procedural due process." *Pedersen v. South Williamsport Area School District,* 677 F.2d 312, 316 (3d Cir. 1982), *cert. denied,* 459 U.S. 972, 103 S.Ct. 305, 74 L.Ed.2d 285 (1982). *See also Perri v. Aytch,* 724 F.2d 362 (3d Cir.1983). Pennsylvania law clearly establishes that the support estate consists of more than simply the right to cause subsidence damage to the surface estate. By waiving a mineral estate owner's liability, a surface estate owner grants to the coal operator the right to gain access to the coal. The coal operator is thereby held harmless for any nonnegligent damage to the surface estate when exercising the right to extract coal. Further, the owner of mineral and support estates has the privilege to dig shafts for access and ventilation without threat of suit from the surface estate owner, *Chartiers Block Coal Company v. Mellon,* 152 Pa. 286, 25 A. 597 (1893); *Westerman v. Pennsylvania Salt Manufacturing Company,* 260 Pa. 140, 103 A. 539 (1918); and the right to disturb underground wells that

feed the surface estate. *Hughes v. Emerald Mines,* 303 Pa.Super. 426, 450 A.2d 1 (1982).

The legislation and regulations, restricting only the surface subsidence effects of coal mining, do not destroy these other "strands" of the support estate. Thus, because there is no physical invasion of the land by the Commonwealth and because the restrictions do not destroy plaintiffs' entire "bundle" of rights in the support estate, we conclude that Section 1406.4 and DER Regulations 89.145 and 89.146 do not constitute a taking.[6]

### IV. Eminent Domain and Public Purpose

Finally, plaintiffs argue that § 1406.15 is an unconstitutional use of the eminent domain power because it forces coal owners to sell coal to private owners to guarantee support of their surface estate. Although coal owners receive just compensation for such a sale, plaintiffs maintain that the forced sale is an eminent domain taking that lacks the required public purpose.

When reviewing eminent domain proceedings to determine whether a public purpose is served, a court must give deference to legislative findings of public purpose, *Berman v. Parker,* 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954), and not substitute the landowner's standard of the

---

**6.** The support estate recognized in Pennsylvania is a nebulous concept. Whereas the surface and mineral estates represent tangible real property, the support estate is more akin to a covenant running with the land. In Montgomery, *The Development of the Right of Subjacent Support and the "Third Estate" in Pennsylvania,* 25 Temple L.Q. 1, 17 (1951), the author states:

The right of subjacent support is a "natural" or proprietary right inhering in the ownership of the surface. It has been called a natural easement; that is, an easement arising, not out of a grant, but from natural rights as conceived by the common law. The right of the owner of such natural right or easement to dispose of the same by appropriate deed or grant is well-settled.

Montgomery suggests that the right of support is more like a covenant running with the land rather than a separate estate in land because the holder of only a support estate has nothing of

value unless he owns either the surface estate or the mineral estate. The only possible value he envisions is nuisance value in keeping title of the support estate away from those who want it—the owners of the surface and mineral estates.

In Casper, *Police Power and the Third Estate,* 53 Dickinson L.Rev. 277 (1949), the author suggests that the state has power to regulate undesirable uses of the support estate as it has to regulate undesirable uses of the surface and mineral estates. Because the constitutionality of land-use regulations is founded on the common law doctrine of nuisance, and the right of an owner to do as he wishes with his land is limited by the prevention of a use that injures a neighbor's property, the author argues, there should be no constitutional prohibition against prohibiting a harmful use of the subsurface as well as the surface.

public need for the standard prescribed by the legislature. Measuring the public need is an act within the discretion of the legislative branch. *Berman v. Parker, supra.*

■ The public need for § 1406.15 has been described by the Pennsylvania General Assembly in § 1406.3(7), which provides that owners of surface structures erected after the effective date of the act must be afforded protection from subsidence damage and that such protection will further other stated purposes of the act, including prevention of damage to the health, safety and welfare of the people of Pennsylvania. This court defers to the legislature's determination of public purpose and, therefore, we hold that § 1406.15 is a constitutional use of the state's power of eminent domain.

Finding no constitutional infirmity, plaintiffs' motion for summary judgment must be denied. Although defendants have moved only for partial summary judgment, we find an absence of any genuine issue of material fact, and therefore judgment will be entered for defendants on all claims of plaintiffs.