502 A.2d 658

James Q. ALBIG and Agnes C. Albig, his wife,

v.

MUNICIPAL AUTHORITY OF WESTMORELAND
COUNTY, Appellant,

v.

REPUBLIC STEEL CORPORATION (Two Cases).

Joseph D. DONATELLI and Dolores C. Donatelli, his wife,

v.

MUNICIPAL AUTHORITY OF WESTMORELAND
COUNTY, Appellant,

v.

REPUBLIC STEEL CORPORATION (Two Cases).

Superior Court of Pennsylvania.

Argued Oct. 16, 1984.

Filed Dec. 20, 1985.

506

508

Rabe F. Marsh, III, Greensburg, for appellant in Nos. 653 and 654 and for appellee in Nos. 655 and 656.

J. Frank McKenna, III, Pittsburgh, for appellant in Nos. 655 and 656 and for appellee in Nos. 653 and 654.

George W. Lamproplos, Greensburg, for Donatelli and Albig, appellees.

Before SPAETH, President Judge, and CAVANAUGH, WIEAND, McEWEN, CIRILLO, OLSZEWSKI, DEL SOLE, JOHNSON and CERCONE, JJ.

WIEAND, Judge:

James and Agnes Albig and Joseph and Dolores Donatelli sustained property damage when water escaped from a reservoir owned by The Municipal Authority of Westmore-

land County (MAWC). A jury found that MAWC had been negligent by failing to make adequate inspections but that MAWC's negligence had not been the cause of the damage to neighboring properties. The escaping water had occurred, rather, as a result of subsidence caused by mining operations conducted beneath the reservoir by Republic Steel Corporation (Republic Steel). The jury found that the Albigs had sustained damages of $28,000.00 and that the Donatelli damages were in an amount of $32,500.00. The trial court rejected the jury's finding that MAWC had not caused the property damage, determined that MAWC was absolutely liable therefor, and molded a verdict in favor of the property owners and against MAWC. The verdict was further molded to allow recovery over by MAWC against Republic Steel. Post-verdict motions were denied, and judgments were entered on the verdict. MAWC and Republic Steel appealed.

MAWC was incorporated in 1942 by the Commissioners of Westmoreland County to provide municipal services to the people and communities of Westmoreland County. In 1956, MAWC purchased a cylindrical reservoir situated on the side of a hill overlooking the Borough of West Newton. The reservoir had been built in 1906 and had a capacity of one million gallons.[1] The Albig and Donatelli properties were downhill from the reservoir. On May 16, 1976, Mrs. Donatelli discovered that water was running into her basement from a flue in the basement wall. MAWC was notified and investigated. It was then discovered that surrounding land areas had become saturated with water. The reservoir was thereafter drained. This revealed that the floor had cracked and pulled away from the sides. The Albigs and Donatellis brought an action against MAWC. Republic Steel was then joined as an additional defendant. Republic Steel had recently conducted mining operations beneath the floor of the reservoir and also in surrounding

1. The walls of the reservoir were nineteen feet in height. Although an enbankment had been placed around the outside of the reservoir, two-thirds thereof was actually above ground level.

areas, leaving a series of tunnels immediately beneath the reservoir. MAWC contended and the jury found that Republic Steel's mining operations had produced a subsidence which had caused the floor of the reservoir to crack and allow water to escape into the surrounding land.

MAWC contends on appeal that it was error for the trial court to hold that it was absolutely liable for damages caused by escaping water and to mold the verdict so as to impose liability upon it. Because the jury found that MAWC's negligence in failing to inspect the reservoir regularly was not a legal cause of the damages to surrounding land, MAWC argues further, its negligence does not support the action of the trial court.

The issue of absolute liability, if not entirely novel, is less than fully settled in the law of this Commonwealth. Absolute liability for injury caused by an abnormally dangerous activity had its genesis in England in the case of *Rylands v. Fletcher*, L.R. 3 H.L. 330 (1868). There, the water from defendants' reservoir had escaped into an abandoned mine, from where it had spread through connecting passages to flood plaintiff's mine. Liability was imposed even though the defendants were found to be free of fault. The court said that a person who for his own purposes uses his land unnaturally to keep and store thereon anything likely to do mischief if it escapes, must keep it at his peril, and if he fails to do so, he is absolutely liable for damages which are the natural consequence of its escape. *Id.* at 338.

The rule of *Rylands v. Fletcher* was not immediately accepted in Pennsylvania, where the better rule was held to be "that those who engage in an undertaking attended with risks to their neighbors are answerable for the conduct of the undertaking with diligence proportioned to the apparent risk...." *Abraham v. Yardum*, 64 Pa.Super. 225, 229 (1916). See also: Prosser and Keaton, *The Law of Torts* § 78, at 548–549 (5th ed. 1984). In 1938, however, the doctrine of *Rylands v. Fletcher* was incorporated into and

articulated by the American Law Institute's Restatement of Torts. Section 519 thereof provided in part as follows:

[O]ne who carries on an ultrahazardous activity is liable to another whose person, land or chattels the actor should recognize as likely to be harmed by the unpreventable miscarriage of the activity for harm resulting thereto from that which makes the activity ultrahazardous, although the utmost care is exercised to prevent harm.

Restatement of Torts § 519 (1938). An ultrahazardous activity was defined as one which (1) necessarily involves a risk of serious harm to the person, land, or chattels of others which cannot be eliminated by the exercise of utmost care, and (2) is not a matter of common usage. *Id.* § 520.

■ Sections 519 and 520 of the Restatement of Torts were adopted as the law of Pennsylvania by the Supreme Court in *Haddon v. Lotito,* 399 Pa. 521, 161 A.2d 160 (1960). There, the Supreme Court, speaking through Justice (later Chief Justice) Eagen, said:

[I]n Pennsylvania it is established that one who carries on an ultrahazardous activity is liable for injury to another whose person, land or chattels the actor should recognize as likely to be harmed by the unpreventable miscarriage of the activity, when the harm results thereto from that which makes the activity ultrahazardous, although the utmost care is exercised to prevent it. This is known as the doctrine of absolute liability.

*Id.,* 399 Pa. at 523, 161 A.2d at 162 (citations omitted). The doctrine of absolute liability has been applied in Pennsylvania primarily to cases in which damages have been caused by blasting. See: *Federoff v. Harrison Construction Co.,* 362 Pa. 181, 66 A.2d 817 (1949); *Bumbarger v. Walker,* 193 Pa.Super. 301, 164 A.2d 144 (1960). Similarly, the doctrine has long been applied to the keeping of wild animals. See: Prosser and Keaton, *The Law of Torts* § 77, at 541–543 (5th ed. 1984). The doctrine, however, has not been limited to cases involving blasting and wild animals. In general, it will be applied to ultrahazardous activities which cannot be

made safe by the exercise of utmost care. *Dambacher v. Mallis,* 336 Pa.Super. 22, 52–53, 485 A.2d 408, 424 (1984).[2]

The Restatement (Second) of Torts has adopted a modified version of the *Rylands v. Fletcher* rule. Thus, Section 519 provides:

(1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.

(2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.

Restatement (Second) of Torts § 519 (1977). In determining whether an activity is abnormally dangerous, the following factors are to be considered:

(a) existence of a high degree of risk of some harm to the person, land or chattels of others;

(b) likelihood that the harm that results from it will be great;

(c) inability to eliminate the risk by the exercise of reasonable care;

(d) extent to which the activity is not a matter of common usage;

(e) inappropriateness of the activity to the place where it is carried on; and

---

**2.** Even those jurisdictions which have rejected *Rylands v. Fletcher* have imposed absolute liability, where appropriate, for nuisances and for direct trespasses to land. Prosser and Keaton, *The Law of Torts* § 78, at 552–554 (5th ed. 1984). "There is in fact probably no case applying *Rylands v. Fletcher* which is not duplicated in all essential respects by some American decision which proceeds on the theory of nuisance; and it is quite evident that under that name the principle is in reality universally accepted." *Id.* at 553 (footnotes omitted). See also: *Magaro v. Metropolitan Edison Co.,* 130 Pa.Super. 323, 197 A. 550 (1938) (liability based on theory of direct trespass to land where water from the defendant's artificial canal had discharged into a natural water course in amounts exceeding that which would have flowed had the land been left in its natural state, thereby flooding the plaintiff's property). Accord: *Amish v. Walnut Creek Development, Inc.,* 631 S.W.2d 866 (Mo.Ct.App.1982)

(f) extent to which its value to the community is outweighed by its dangerous attributes.

Restatement (Second) of Torts § 520.

This approach incorporates a more flexible standard by which to determine whether an activity is so abnormally dangerous as to require a person to be strictly liable for all harm caused thereby. "The essential question is whether the risk created is so unusual, either because of its magnitude or because of the circumstances surrounding it, as to justify the imposition of strict liability for the harm that results from it, even though it is carried on with all reasonable care. In other words, are its dangers and inappropriateness for the locality so great that, despite any usefulness it may have for the community, it should be required as a matter of law to pay for any harm it causes, without the need of a finding of negligence." Restatement (Second) of Torts § 520, comment f.

"Whether the activity is an abnormally dangerous one is to be determined by the court.... The imposition of strict liability ... involves a characterization of the defendant's activities or enterprise itself, and a decision as to whether he is free to conduct it at all without becoming subject to liability for the harm that ensues even though he has used all reasonable care. This calls for a decision of the court; and it is no part of the province of the jury to decide whether an industrial enterprise upon which the community's prosperity might depend is located in the wrong place or whether such an activity as blasting is to be permitted without liability in the center of a large city." Restatement (Second) of Torts § 520, comment 1. See also: *Clark-Aiken Co. v. Cromwell-Wright Co.*, 367 Mass. 70, 91, 323 N.E.2d 876, 888 (1975). Compare: *Azzarello v. Black Brothers Co.*, 480 Pa. 547, 391 A.2d 1020 (1978).

■ We conclude that the collection and storage of a large quantity of water on a hillside reservoir in proximity to a residential community may well constitute that kind of activity which, as a general rule, will be considered "abnormally dangerous" when conducted by a commercial enter-

prise. See: Restatement (Second) of Torts § 520, comment j. A reservoir, so located, presents not only a great risk to those whose homes lie beneath it, but the consequences of a breach of such a reservoir are likely to be devastating. On the other hand, modern engineering has demonstrated that water can now be stored in large quantities with relative safety if due care is exercised.

█ In any event, a critical consideration in determining whether MAWC shall be held absolutely liable for maintaining water in a reservoir is whether "its value to the community is outweighed by its dangerous attributes." Restatement (Second) of Torts § 520(f). "Even though the activity involves a serious risk of harm that cannot be eliminated with reasonable care and it is not a matter of common usage, its value to the community may be such that the danger will not be regarded as an abnormal one." *Id.,* comment k. In such instances, liability may be imposed only for failure to exercise a degree of care commensurate with the dangerous character of the activity.

█ MAWC was created, as we have already observed, to provide municipal services to the people of Westmoreland County. The reservoir overlooking the Borough of West Newton was purchased and maintained for the purpose of storing a municipal water supply. Although it was not the primary source of water for West Newton, the reservoir was deemed necessary to provide a water reserve and to enhance the firefighting capabilities of the fire department. It served also to equalize pressure in the water distribution system. Under these circumstances, we conclude that the value of the reservoir to the community outweighed its potentially dangerous qualities. Therefore, the authority's maintenance of its reservoir was not an abnormally dangerous activity. The storage of water for community use was not an activity in which MAWC could engage only at its peril. It was liable for water escaping from its reservoir only if it failed to exercise care commensurate with the risk.

Having concluded that MAWC was not engaged in an abnormally dangerous activity when it stored water for community use, we do not now decide whether a privilege to store water in a reservoir existed under Section 521 of the Restatement (Second) of Torts. Cf. *Lobozzo v. Adam Eidemiller, Inc.*, 437 Pa. 360, 263 A.2d 432 (1970); *Laventhol v. A. DiSandro Contracting Co.*, 173 Pa.Super. 522, 98 A.2d 422 (1953). We observe, however, that our holding is consistent with the Restatement rule that absolute liability is not to be imposed where an otherwise hazardous activity is carried on in pursuance of a public duty.

 MAWC was required to exercise a degree of care commensurate with the risk of storing water in this reservoir and would be liable if its negligence made it possible for water to escape with resulting damage to property. The property owners' evidence showed and the jury found that MAWC had failed to conduct adequate inspections of its seventy year old reservoir.[3] Normally, this would be a sufficient basis upon which to predicate liability. Here, however, the jury found that MAWC's negligence was not the legal cause of appellees' property damage. Instead, the jury found, the legal cause of the escaping water was the mine subsidence which had produced a cracking of the reservoir floor, with resulting escape of water. This subsidence, the jury found, was an unforeseeable, intervening act of a third party.

The courts, even those which have imposed absolute liability for damages caused by escaping water, have generally held that the owner of the water cannot be held liable where the escape of water has been caused by third party acts which the owner could neither control nor anticipate. See: Annot., 169 A.L.R. 517, 544 (1947). Thus, in *Box v. Jubb*, L.R. 4 Ex.Ch. 76 (1879), an English court declined to follow *Rylands v. Fletcher, supra,* where an overflow of a defendant's reservoir had been caused by the emptying of a

3. The property owners also contended that MAWC should have drained the reservoir more quickly in order to minimize the damage.

large quantity of water from the upstream reservoir owned by a third person. The court said:

> There has been an overflow from the reservoir which caused damage to the plaintiff. The question is, what was the cause of this overflow? Was it anything for which the defendants are responsible—did it proceed from their act or default, or from that of a stranger over whom they had no control? The case is abundantly clear on this, proving beyond a doubt that the defendant had no control over the causes of the overflow, had no knowledge of the existence of the obstruction. Matters complained of took place through no default or breach of duty of the defendants, but were caused by a stranger over whom and at a spot where they had no control. It seems to me to be immaterial whether this is called a vis major or the unlawful act of a stranger; it is sufficient to say that the defendants had no means of preventing the occurrence.

See also: *Cohen v. Brockton Sav. Bank*, 320 Mass. 690, 71 N.E.2d 109 (1947). See generally: *Wheatland Irrigation District v. McGuire*, 537 P.2d 1128 (Wyo.1975).

The third party act in the factual scenario of the instant case was the mining operation conducted by Republic Steel. It was this mining operation which caused the subsidence. Therefore, we examine the issue of Republic Steel's liability.

▓▓ Section 4 of The Bituminous Mine Subsidence and Land Conservation Act of April 27, 1966, Sp. Sess., P.L. 31, as amended, 52 P.S. § 1406.4, provides in part as follows:

> In order to guard the health, safety and general welfare of the public, *no owner, operator,* lessor, lessee, or general manager, superintendent or other person in charge of or having supervision over any bituminous coal mine *shall mine bituminous coal so as to cause damage as a result of the* caving-in, collapse or *subsidence of the following structures in place on April 27, 1966,* overlying or in the proximity of the mine:

> (1) Any public building or any noncommercial structure customarily used by the public, including but not being limited to ... municipal utilities or municipal public service operations.

. . . . .

(Emphasis added). This statute establishes an absolute duty upon mine operators to prevent subsidence of structures protected by the Act. See: *DeLuca v. Buckeye Coal Co.*, 463 Pa. 513, 518, 345 A.2d 637, 639 (1975). The reservoir owned by MAWC, which had been constructed in 1906 and which was used as part of a community water distribution system, was a structure protected by the Act. It was a noncommercial structure used as part of a municipal, public service operation. As such, it was entitled to be protected absolutely against subsidence or collapse as a result of mining operations.

The jury was instructed that Republic Steel would be liable if its mining operation had caused the subsidence and cracking of the floor of MAWC's reservoir which permitted water to escape and damage the Albig and Donatelli properties. This was a correct instruction and in keeping with the mandate of The Bituminous Mine Subsidence and Land Conservation Act of 1966.[4] The jury specifically found that Republic Steel's mining operation had caused a subsidence of the floor of the reservoir and that this phenomenon had made it possible for water to escape and damage neighboring properties.

Republic Steel argues that the Act created liability only to the owner of the structure which was actually damaged by subsidence. It argues, therefore, that it cannot be liable in this case because the Albig and Donatelli properties were not damaged by subsidence, cave-in or collapse. We reject this argument. Section 4 of the Act provides that no mining operation shall be conducted "so as to *cause damage as a result of* the caving-in, collapse or *subsidence* of

---

4. Although the trial court instructed the jury that a subsidence caused by Republic Steel's mining operations was negligence as a matter of law, the court's use of the word "negligence" was harmless.

the following surface structures...." (emphasis added). The purpose of the Act is stated, in section 2, to be "for the protection of the health, safety and general welfare of the people of the Commonwealth, by providing for the conservation of surface land areas ..., [and] to aid in the protection of the safety of the public...." 52 P.S. § 1406.2. It was for this reason that the legislature imposed upon those involved in bituminous coal mining operations the burden of protecting absolutely those improvements already in place. Section 19 of the Act suggests that its provisions are intended to be remedial and shall receive a liberal construction. 52 P.S. § 1406.19. "[S]ince the purpose of the statute is remedial and the statute is to be construed liberally 'such as will best effectuate that purpose,' to imply a restriction where none is expressed would be inconsistent with the clear language and spirit of the statute." *DeLuca v. Buckeye Coal Co., supra,* 463 Pa. at 518, 345 A.2d at 639 (footnote omitted). We hold, therefore, that subsidence of the floor of the reservoir caused by Republic Steel's mining operations rendered Republic Steel liable for all damages legally caused by water which escaped from MAWC's reservoir because of such subsidence. Here, the jury was asked by special interrogatory to determine the causation issue and found that Republic Steel's mining operation had caused the escape of the reservoir water and, therefore, was the legal cause for the damage to the Albig and Donatelli properties.[5]

 Republic Steel argues that it is entitled to a new trial because the trial court permitted the jury to learn that other homeowners had filed subsidence claims against Republic Steel. This information was contained on mining maps and drawings used by witnesses to define the extent

5. Republic Steel has not raised and we do not decide whether The Bituminous Mine Subsidence and Land Conservation Act of 1966 is constitutional under *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922). We observe, however, that a federal court sitting in Pennsylvania has upheld the law. See: *Keystone Bituminous Coal Association v. DeBenedictis,* 581 F.Supp. 511 (W.D.Pa. 1984). See also and compare: *Patton v. Republic Steel Corp.,* 342 Pa.Super. 101, 492 A.2d 411 (1985).

of Republic Steel's mining operations and the points of subsidence which had been caused thereby. A geologist, called to testify by MAWC, said that these other subsidences had occurred in a similar geologic and topographic setting, and he opined that the same falls in the mine roof could have caused both the cracking of the floor of the reservoir and the damage to nearby homes. Republic Steel complains that the maps and drawings referred to by the witness designated additional homes where unproven subsidence claims had originated. This, it is contended, was prejudicial error.

 Unofficial maps are usually admissible as evidence when verified by the testimony of a witness who has personal knowledge of their accuracy. 14 P.L.E. *Evidence* § 222 (1959). The fact that a map, which is otherwise relevant, shows an area larger than that involved in the case at issue does not make the map inadmissible. *Stafford v. New York Central Railroad Co.*, 80 Pa.Super. 408, 410 (1923). In determining the admissibility of maps and diagrams, much must be left to the discretion of the trial judge. *Jones v. Spidle*, 446 Pa. 103, 108, 286 A.2d 366, 368 (1971). In the instant case, we perceive no abuse of that discretion. ·There was no testimony regarding subsidence damage not relevantly connected with the cause of the subsidence at the reservoir, and the trial court was not required to exclude relevant plans merely because they identified the location of additional unproven claims of subsidence. Their designation aided in an understanding of the geologists testimony; and it was enough that the jury understood that such additional claims were not involved in the present litigation.

 Republic Steel also contends that the trial court erred in permitting Reginald Briggs, a geologist, to testify that a process of "winnowing" had caused "piping" under the Donatelli home. "Winnowing" the witness defined as the removal of finer material from a sedentary body by the passage of water. "Piping," he said, occurred when voids were created in sub-surface earth. He opined that winnow-

ing and piping had occurred under the Donatelli family room addition, which had been constructed without a foundation, and had caused it to move or slide laterally. Republic Steel argues that because he had not actually observed these phenomena, the geologist's testimony was mere conjecture.

The admission of expert opinion testimony is within the sound discretion of the trial court. *Klyman v. Southeastern Pennsylvania Transportation Authority,* 331 Pa.Super. 172, 177, 480 A.2d 299, 302 (1984); *Mapp v. Dube,* 330 Pa.Super. 284, 293, 479 A.2d 553, 557 (1984). "An opinion of an expert based upon an adequate factual foundation is neither speculative nor conjecture, but a legitimate inference and as such has evidentiary value in determining disputed questions of fact. *Hussey v. May Department Stores, Inc.,* 238 Pa.Super. 431, 436, 357 A.2d 635, 637 (1976), quoting *Marrazzo v. Scranton Nehi Bottling Co.,* 422 Pa. 518, 530, 223 A.2d 17, 23–24 (1966).

Briggs' opinion was based not on conjecture or surmise but upon facts known or observed from which he could reasonably infer that ground under the Donatelli family room had undergone piping because of water entering from the reservoir. Although Briggs had not directly observed the ground beneath the family room, his conclusion was drawn from established facts and circumstances and was within the area of his expertise as a geologist. The trial court did not abuse its discretion by allowing Briggs to testify that piping had occurred and needed to be repaired in order to stabilize the ground on which the family room addition was situated.

Finally, Republic challenges the testimony of Allan Sethman, the president of Alda Construction Co., who testified at trial that his company had estimated the cost of rebuilding the Albig retaining wall at $25,800.00. In 1979, Sethman and David Ferguson, another employee of Alda Construction Co., had examined the damaged retaining wall and had discussed its rehabilitation. Ferguson then prepared a proposal and cost estimate which he and Sethman

reviewed together. Republic contends that Sethman's testimony was inadmissible hearsay because it was Ferguson, who was not available to testify at trial, and not Sethman who had actually prepared the estimate. We disagree. The testimony was that Sethman had actively participated in inspecting the retaining wall and in determining the method for rebuilding the same. The trial court found and the evidence confirmed that the estimate had been the joint work product of Sethman and Ferguson. Therefore, Sethman's testimony at trial was not hearsay but was derived from his own, direct knowledge. His estimate of cost to repair the damaged wall was properly admitted into evidence.

We conclude, for all the foregoing reasons, that the findings of the jury should not be disturbed. Pursuant to those findings, Republic Steel was solely liable to the appellee property owners for damages caused by escaping water. To the extent that the trial court molded the verdict otherwise, it fell into error.

Reversed and remanded for the entry of judgment in accordance with the foregoing opinion.

McEWEN, J., files a dissenting opinion in which SPAETH, President Judge, joins.

CERCONE, J., did not participate in the consideration or decision of this case.

McEWEN, Judge, dissenting:

The majority holds that the Westmoreland County Municipal Authority's maintenance of a hillside reservoir was not an abnormally dangerous activity as a result of its decision that "the value of the reservoir to the community outweighed its potentially dangerous qualities." At 664. While the depth of my respect for my colleagues of the majority causes me great hesitation, I must, nonetheless, most respectfully, dissent.

Section 520(f) of the Restatement (Second) of Torts requires a court to consider, when determining whether an

activity is abnormally dangerous, the "extent to which its value to the community is outweighed by its dangerous attributes." The comment to clause (f) provides:

"[The] value to the community may be such that the danger will not be regarded as an abnormal one. *This is particularly true when the community is largely devoted to the dangerous enterprise and its prosperity largely depends upon it.* Thus, the interests of a particular town whose livelihood depends upon such an activity as manufacturing cement may be such that cement plants will be regarded as a normal activity for that community notwithstanding the risk of serious harm from the emission of cement dust." (emphasis supplied).

I am of the view that the application of clause (f) of Section 520 of the Restatement (Second) of Torts should result in a determination that the activity is *not* abnormally dangerous *only* when the individuals imperiled by the activity are also the individuals benefited by the activity. In the instant case, a small number of individuals in the community were subject to the risks posed by the reservoir while the benefits enured to the entire community.

We are here called upon to establish policy and I deem the fairer policy to be one that requires the court to weigh and balance the value *to whom* and the danger *to whom*, in determining whether an activity is or is not unreasonably dangerous under Section 520(f). Only when the segment of the community that receives the benefit of the activity is also the segment of the community which is placed at risk by the activity, should subsection 520(f) result in a finding that the activity is not abnormally dangerous. Thus, I would here find that consideration of the factors in Section 520 should result in a finding that the reservoir was abnormally dangerous since the activity imperiled only a small segment of the community while the benefits from the activity flowed to the entire community.

The concept of risk distribution mirrors, perhaps, a resolution of such discomfort as is triggered by the notion that many benefit from the risk of a few. Thus, I deem it

preferable, at this stage of the history of strict liability, to apply the analysis and principles of risk distribution to cases arising under clause (f) of Section 520, since the imposition of strict liability in cases where an ultrahazardous activity benefits an entire community but poses a risk to only a small segment of that community will result in a more equitable distribution of the losses caused by such activity.

Justification for this interpretation of Sections 519 and 520 has been ably expressed by Chief Judge (now Senior Judge) Thomas J. MacBride in *Chavez v. Southern Pacific Transportation,* 413 F.Supp. 1203 (E.D.Calif.1976):

> "[T]he risk distribution justification for imposing strict liability is well suited to claims arising out of the conduct of ultrahazardous activity. The victims of such activity are defenseless. Due to the very nature of the activity, the losses suffered as a result of such activity are likely to be substantial—an 'overwhelming misfortune to the person injured.' .... By indirectly imposing liability on those that benefit from the dangerous activity, risk distribution benefits the social-economic body in two ways: (1) the adverse impact of any particular misfortune is lessened by spreading its cost over a greater population and over a longer time period, and (2) social and economic resources can be more efficiently allocated when the actual costs of goods and services (including the losses they entail) are reflected in their price to the consumer."

*Chavez v. Southern Pacific Transportation Co., supra* at 1209 (footnote omitted). *Accord Indiana Harbor Belt Railroad Company v. American Cyanamid Company,* 517 F.Supp. 314 (N.D.Ill.1981); *National Steel Service Center, Inc. v. Gibbons,* 319 N.W.2d 269 (Iowa, 1982).

Nor do I believe that Section 521 of the Restatement (Second) of Torts would afford immunity to the Municipal Authority under the facts of the instant case. The Section 521 issue was not, of course, a subject of discussion by our esteemed colleague Judge Donald E. Wieand in his excellent opinion for the majority since that issue had not been raised

by any of the parties and since that issue had become merely academic by reason of the conclusion of the majority that the activity of the Municipal Authority was not abnormally dangerous.

However, since this dissenting view has concluded that the activity of the Municipal Authority was abnormally dangerous, the nature of the immunity afforded by Section 521 becomes a pertinent issue. As we have noted, the majority does not discuss the issue, but it does note two Pennsylvania cases, namely, *Lobozzo v. Adam Eidemiller, Inc.*, 437 Pa. 360, 263 A.2d 432 (1970) and *Laventhol v. A. DiSandro Contracting Co.*, 173 Pa.Super. 522, 98 A.2d 422 (1953). Our scrutiny of those cases leads us to conclude that Section 521 is applicable only to public *officers* or *employees*. Justice Pomeroy in *Lobozzo* notes that "Section 521 and comment (a)[2] thereto appear to recognize that governmental bodies must, on occasion, engage in ultrahazardous activity for the public benefit and that a *public officer* or *employee* has the duty of conducting such activity thrust upon him by virtue of his position. Because the governmental unit may be either immune from suit or immune from liability for harm caused by such activity, the full burden of absolute liability would fall squarely upon the individual public servant, absent the Section 521 exception. Yet, the individual public officer or employee can neither control the degree of hazard he will create nor dictate the compensation he will receive for the performance of his required duties." *Id.* 437 Pa. at 363, 263 A.2d at 434 (emphasis supplied).[1]

1. The precise ruling is that a private contractor is not within the exceptions created by Section 521 even though the private contractor is performing work at the direction and under the authorization of a governmental body. The decision also makes clear and certain that the insulation from liability for ultrahazardous activity is limited to governmental officials and is not meant to cover ultrahazardous activity at the direction of government agencies.

It might be argued that Section 521 assumed the immunity of government agencies and sought to extend that immunity to the officials of the government agencies. If that be so, the immunity that it assumed was the immunity that is conferred upon government while it carries

Our research has uncovered but one pertinent case, *McLane v. Northwest Natural Gas Company*, 255 Or. 324, 467 P.2d 635 (1970), in which a wrongful death action was instituted against a public utility after the plaintiff's decedent was killed while insulating a gas storage tank under construction. The defendant argued that as a public utility it was authorized by the state to store and distribute natural gas and was, therefore, immune from liability by virtue of Section 521. The court quoted Section 521 of *Tentative Draft No. 10* of the Restatement (Second) of Torts, which provided "[t]here is no strict liability for an abnormally dangerous activity if it is carried on in pursuance of a public duty imposed upon the actor, or a franchise or authority conferring legislative approval of the activity." The comment to the proposed draft provided, *inter alia:*

b. Even where there is no duty to engage in the abnormally dangerous activity, the defendant may be protected from strict liability by a sanction conferred by the legislature, under circumstances such as to indicate approval of the activity sufficient to confer immunity. Normally this is the case when, under a franchise given to such a defendant as a common carrier, it is authorized but not required to accept dangerous commodities for transportation. It may likewise be the case where the legislature grants to a defendant authority to engage in an activity of the abnormally dangerous kind, as where, in wartime, a defendant is authorized to construct and operate a plant making explosives in an area of special danger.

On the other hand, it is not every authorization or permission to engage in an activity which can be taken to confer immunity from strict liability, by giving such approval to the activity as to indicate an intent that the defendant shall not be liable. In the absence of special circumstances indicating such an intent, the normal interpretation of the act of the legislature in granting a

out its governmental duties and not while it conducts proprietary operations.

franchise or authority to act in such a manner is that the defendant is authorized to proceed, but must be strictly responsible if the activity in fact results in harm to those in the vicinity.

The *McLane* court held that "[t]he proposed section lends no aid to defendant's contention. We do not believe the fact that the state has authorized defendant to engage in the abnormally dangerous activity in question demonstrates any intention to predetermine where responsibility should lie in the case of a non-negligent miscarriage of the activity." *Id.* at 336, 467 P.2d at 641.

We hasten to note, of course, that the form in which Section 521 was adopted omits the terms "franchise" and "authority", and specifically provides immunity for "public officers" and "employees" only. I, therefore, believe that Section 521 provides immunity only for public officers and employees and find it inapplicable to the activity of the Authority in the instant case.

I would, therefore, reinstate the judgment as entered by the distinguished Judge Joseph A. Hudock.

SPAETH, President Judge, joins this dissenting opinion.