## Hussey v. May Department Stores, Inc., Appellant.

432

Argued November 25, 1975. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

434

*Theodore E. Breault*, with him *Egler and Reinstadtler*, for appellant.

*Robert H. Somerton*, with him *Zupancic and Somerton*, for appellee.

OPINION BY SPAETH, J., February 2, 1976:

Mrs. Katherine Hussey, appellee, filed a complaint in trespass on March 13, 1973 alleging that she had suffered hair and scalp damage because of a permanent wave administered to her in a beauty salon operated by appellant, Kaufmann's Department Store in suburban Pittsburgh. After a jury trial, appellee received a verdict of $27,000.00.

On appeal from the denial of its motion for a new trial, appellant argues: that the testimony of appellee's expert concerning the cause of her injuries was not competent; that the trial judge erred in permitting two photographs of appellee to be introduced into evidence; and that the jury's verdict was excessive.

I

Appellee's expert witness was Francis J. Krugh, M.D., a dermatologist. Dr. Krugh initially examined appellee on December 24, 1971, less than two months after the allegedly injurious permanent wave. At the time of the initial examination, appellee told Doctor Krugh that she had experienced a severe burning sensation on her scalp shortly after Mrs. Jean McVerry, a beautician employed by appellant, had poured permanent waving solution on the scalp (N.T. 97). Dr. Krugh's examination revealed that the top of appellee's head was dull red and unduly hot, her scalp was sensitive to the touch, and her hair

was damaged (*id.*). Subsequent examinations showed increased hair damage, tightness of the scalp, and continued sensitivity to heat and cold (N.T. 99). Based upon his examinations of appellee and the medical history he received from her, Dr. Krugh diagnosed appellee's condition as chemical contact dermatitis caused by the permanent wave administered to her (N.T. 101).

Appellant's expert witness was Saul R. Bergad, M.D., a dermatologist who had first examined appellee on September 17, 1974. The reason Dr. Bergad's examination of appellee occurred nearly three years after the allegedly injurious permanent wave was that the doctor originally engaged by appellant died before trial. Dr. Bergad found no evidence of chemically induced damage to appellee's hair or scalp (N.T. 172). On the contrary, his examination of appellee's scalp disclosed no scarring or redness that would have been produced by a chemical agent (N.T. 170). His diagnosis, which agreed with the written findings of the deceased doctor, was that appellee suffered from senile-type alopecia, *i.e.*, normal hair loss attendant upon old age. Appellee was seventy one years old at the time of trial.

It was for the jury, of course, to credit or reject the expert testimony. *Rose v. Hoover,* 231 Pa. Superior Ct. 251, 259, 331 A.2d 878, 882 (1974). Appellant's contention, however, is that Dr. Krugh's testimony should have been stricken as incompetent.

## A

The admission of expert opinion evidence is a matter within the sound discretion of the trial court, and appellate review is correspondingly limited. *Laubach v. Haigh,* 433 Pa. 487, 491, 252 A.2d 682, 683 (1969). Expert testimony, however, is incompetent and may not be admitted into evidence if the expert's opinion is based upon mere conjecture. *Collins v. Hand,* 431 Pa. 378, 390, 246 A.2d 398, 404 (1968) ; *Simmons v. Mullen,* 231 Pa. Superior Ct. 199, 211, 331 A.2d 892, 899 (1974).

An opinion may be found conjectural because of the manner in which it is expressed. As stated in *Menarde v. Philadelphia Trans. Co.,* 376 Pa. 497, 501, 103 A.2d 681, 684 (1954):

> "Moreover the expert has to testify, not that the condition of claimant might have, or even probably did, come from the accident, but that in his professional opinion the result in question came from the cause alleged. A less direct expression of opinion falls below the required standard of proof and does not constitute legally competent evidence."

*Accord, Woods v. Pleasant Hills Motor Co.,* 454 Pa. 224, 234, 309 A.2d 698, 703 (1973) ; *Houston v. Canon Bowl, Inc.,* 443 Pa. 383, 386, 278 A.2d 908, 910 (1971) ; *Smail v. Flock,* 407 Pa. 148, 152-153, 180 A.2d 59, 61 (1962). This does not mean that the expert must express his opinion as a matter of absolute certainty. *Simmons v. Mullen, supra* at 211, 331 A.2d at 899. Also, in appraising the degree of certainty it may be necessary to scrutinize the language employed by the expert in articulating his opinion.

> "An opinion of an expert based upon an adequate factual foundation is neither speculative nor conjectural, but a legitimate inference and as such has evidentiary value in determining disputed questions of fact. 'It is the intrinsic quality of the conclusion that matters, and not the label or characterization. Words mean what they manifest. Their meaning may vary. As Mr. Justice Holmes said [citation omitted] "A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." The word "speculative" has a varied meaning. Sometimes it is used as meaning a conclusion reached by the faculty or process of intellectual examination, search, and reasoning; sometimes as meaning conjecture, guesswork

and surmise [citations omitted].'" *Marrazzo v. Scranton Nehi Bottling Co.*, 422 Pa. 518, 530-531, 223 A.2d 17, 23-24 (1966).

An opinion may also be found conjectural because it does not have an adequate basis in fact. An expert's opinion may be based upon personal examination, or upon the assumed truth of the testimony of other witnesses adduced in court, or upon a combination of these two sources. *Jackson v. U. S. Pipe Line Co.*, 325 Pa. 436, 440, 191 A. 165, 166 (1937); *Gordon v. State Farm Life Ins. Co.*, 415 Pa. 256, 260, 203 A.2d 320, 322 (1964); *Rose v. Hoover, supra* at 254, 331 A.2d at 880. The vehicle through which counsel may elicit an opinion based upon the testimony of other witnesses is the hypothetical question:

> "... an expert witness can testify to the cause of an accident only if he either made a personal observation of the scene of the accident or answers hypothetical questions based on certain assumptions, those assumptions being based upon 'such facts as the jury would be warranted in finding from the evidence.'" [citations omitted].

*Houston v. Canon Bowl, Inc., supra* at 385, 278 A.2d at 910. Ideally, the hypothetical question also serves clearly to present the basis of the expert's opinion to the trier of fact. J. Maguire, J. Weinstein, J. Chadbourn & J. Mansfield, Evidence 388 (6th ed. 1973); *but see Rabata v. Dohner*, 45 Wis. 2d 111, 172 N.W. 2d 409 (1969); F.R. Evid. 705.

## B

Judged by the foregoing standards, certain portions of Dr. Krugh's testimony arguably support appellant's contention that the testimony was incompetent. The doctor at times seemingly disregarded the Supreme Court's admonition that "[i]t is not enough to say that something *could* have happened. Anybody can guess."

*Smail v. Flock, supra* at 152-153, 180 A.2d at 61 (emphasis in original). For example, he spoke of his "assumptions" concerning causation:

"But *if* some of this chemical penetrates below the surface of the scalp down into the hair follicle damage would be done to the hair-making cells.

MR. BREAULT [defense counsel]: . . . I would object because there is no evidence that the solution involved penetrated beneath the scalp . . . (N.T. 103)

I have to conclude on that basis that the hair follicle itself, the hair matrix, the birth cells have been damaged in this process *somehow, some way* . . . [T]hese cells *apparently* have been damaged in this process . . . it [the permanent wave solution] is also capable of getting down in the follicle and doing damage if it is allowed to stay on too long or change the concentration or whatever *might have happened* (N.T. 105).

The lady laying down, these nerve endings are very close to the surface of the skin and *I have to assume* the cause of the sensory disturbance that this lady sustained, that this material penetrated to this keratin also enough to sensitize these nerve endings below the surface. (N.T. 107)

*I am assuming* from the damage that I saw that the only way I could account for it would be that the solution was allowed to remain on too long. (N.T. 112)" (Emphasis added throughout.)

When the entirety of Dr. Krugh's testimony is considered, however, it is evident that his opinion was rendered with reasonable medical certainty and was properly based upon " 'personal observation combined with assumed facts appearing in the evidence.' " *Gordon v. State Farm Life Ins. Co., supra* at 260, 203 A.2d at 322.

A large portion of Dr. Krugh's testimony was adduced through hypothetical questions in which he was asked to assume the truth of testimony already in evidence. In

addition, as previously indicated, appellee had related her medical history to the doctor and had been examined by him. After the doctor had stated his clinical findings, he was asked the following question:

"Doctor, based upon your various examinations, the medical history that you received and what you saw on various times, were you able to formulate a diagnosis with reference to this case?" (N.T. 101).

This question set forth clearly the basis of the elicited expert opinion. The doctor's response was equally clear and unequivocal: "I made a diagnosis of contact dermatitis due to the permanent waving procedure." *(Id.)*

Dr. Krugh then expanded upon his diagnosis by using a visual aid that depicted the scalp and hair (N.T. 102). His explanation indicated that the permanent wave solution used on appellee's head contained ammonia thioglycolate, a chemical capable of penetrating the keratin composing the hair. (N.T. 102) (This information had been introduced into evidence by Arthur W. Forbriger, a vicepresident of Revlon Realistic Professional Products, the manufacturer of the permanent waving solution (N.T. 74 *et seq.*).) Dr. Krugh stated that, assuming the truth of Mr. Forbriger's testimony, the acid concentration in the curling lotion was such that "[i]t is considered to be a primary irritant and it does have the capability of producing the chemical burn if it is allowed to stay on say too long" (N.T. 106).

Dr. Krugh was also asked to assume the truth of appellee's testimony that Mrs. McVerry, the beautician at appellant's beauty salon, had applied the permanent wave solution directly from a squeeze bottle. The doctor was then asked whether he had "an opinion, based upon reasonable medical certainty, as to whether there is a relationship between these facts and the diagnosis that you have set forth for us in the hearing . . ." He replied:

"Directly related, however, it was poured on her, not all of it arrived on the surface of the skin in equal

direction throughout the surface of the scalp. There was some of it shielded by the intervening hair and it is a spotty distribution of this chemical damage on the surface of the scalp." (N.T. 110)

Dr. Krugh was further asked to assume the truth of appellee's testimony that the beautician had left the permanent wave solution on her hair for thirteen minutes. It was in this context that Dr. Krugh made the statement referred to previously that he was "assuming from the damage I saw that the only way I could account for it would be that the solution was allowed to remain on too long" (N.T. 112). As appellant's expert, Dr. Bergad, acknowledged, however, dermatological examinations are visual and do not involve laboratory work (N.T. 186.) Thus Dr. Krugh's "assumption" was in fact his professional opinion, based upon his clinical examination, of the cause of appellee's hair loss and damage. In addition, the doctor testified that appellee's complaints about feeling a burning sensation could only be explained by chemical penetration of the scalp: "It [the permanent wave solution] would have to penetrate the entire epidermis and arrive at the upper portion of the dermis where the nerve endings are located." (N.T. 113)

Based upon the foregoing analysis of the record, we conclude that the testimony of Dr. Krugh as appellee's expert concerning the cause of appellee's injuries was competent. The trial court consequently did not err in refusing to strike it from the record.

## C

In addition to Dr. Krugh's testimony, there was testimony by other witnesses regarding causation. Although this testimony formed the basis for the hypothetical questions addressed to the doctor, it was also independently relevant to the issue of causation, since negligence may be established by circumstantial evidence. *Phelps v. Paul L. Britton, Inc.,* 412 Pa. 55, 58, 192 A.2d

689, 691 (1963); C. Morris, Torts 166-167 (1953). *See also Smith v. Bell Telephone Co. of Pa.*, 397 Pa. 134, 138-139, 153 A.2d 477, 480 (1959) (discussion of requisite quantum of circumstantial evidence to support a verdict.)

Jerome Galiszewski was a hairdresser at a Gimbel's beauty salon in suburban Pittsburgh. Appellee had gone to that salon in the late fall of 1971 complaining of hair breakage due to the permanent wave she had received at appellant's salon. Mr. Galiszewski noticed that appellee's scalp was red and tight, and treated her hair breakage with hair conditioners (N.T. 66). When appellee complained that she suffered from headaches, Mr. Galiszewski suggested that she see a physician (N.T. 69). Thus, Mr. Galiszewski corroborated Dr. Krugh's testimony about the condition of appellee's hair and scalp, and, conversely, impeached the diagnosis made by appellant's expert, that appellee's hair loss was not abnormal for a woman of her age.

Appellee testified that in June, 1971, she had received a permanent wave from a Mr. Angelo, another beautician at appellant's beauty salon. According to appellee, Mr. Angelo told her that her scalp was in excellent condition, and that she should be sure to tell any beautician who worked on her hair in the future that the permanent wave solution should remain on her hair for only six minutes (N.T. 6). Mr. Angelo also entered this information on an index card kept in the salon. Appellee explained to Mrs. McVerry, the beautician who worked on appellee's hair in October, what Mr. Angelo had said. Mrs. McVerry, however, disregarded this information and kept the solution on appellee's hair for thirteen minutes (appellee, concerned that Mr. Angelo's instructions were not being followed, kept close watch on the time) (N.T. 13-14). Mrs. McVerry acknowledged that appellee had infomed her of her sensitive scalp (N.T. 145, 217), that she had consulted the index card (N.T. 218), and that the card indicated that appellee's hair should

curl for six minutes (N.T. 141, 218). The card was introduced into evidence as a business record (N.T. 144).

Finally, appellee also testified that Mr. Angelo had cautioned her that cotton should be placed between the hair curlers prior to application of the permanent wave solution, due to appellee's sensitive scalp (N.T. 8-9). Nonetheless, Mrs. McVerry said that such a procedure would not be helpful and would waste time. Consequently, she applied the solution directly to appellee's hair. Shortly thereafter, appellee's scalp began to burn, and Mrs. McVerry expressed amazement that appellee's scalp was so absorbent (N.T. 9).

The foregoing testimony, in conjunction with Dr. Krugh's expert opinion, amply justifies a finding that appellee's injuries were caused by the permanent wave procedure.

## II

Over appellant's objection, the trial court admitted into evidence two photographs offered by appellee to show her hair style before the allegedly injurious permanent wave. At trial, appellant's counsel objected on the ground that one photograph, Plaintiff's Exhibit 1, had been taken five to six years before the permanent wave, while the other, Plaintiff's Exhibit 2, had been taken approximately six months before the permanent wave. On appeal, appellant advances the broader contention that the photographs were "completely immaterial to the subject matter of the lawsuit" (Appellant's Brief at 9).

In determining whether a trial error warrants the granting of a new trial, "our inquiry is whether the court below abused its discretion or committed an error of law which controlled the outcome of the case. . . ." *Noel v. Puckett*, 427 Pa. 328, 332, 235 A.2d 380, 382 (1967). Therefore, even if we were to conclude that the trial court erred in admitting the photographs into evidence,

we would have to determine whether its error affected the outcome of the case. We conclude, however, that no error was committed.

First, despite the passage of time between the taking of the photographs and the date of appellee's permanent wave, appellee testified that she had worn her hair the same way for all of her life (N.T. 23). The photographs were therefore properly authenticated by appellee herself; she had "sufficient knowledge to state that [each photograph] fairly and accurately represents the object or place reproduced as it existed at the time of the accident. . . ." *Nyce v. Muffley*, 384 Pa. 107, 111, 119 A.2d 530, 532 (1956); *see also Med-Mar, Inc. v. Dilworth*, 214 Pa. Superior Ct. 402, 415, 257 A.2d 910, 917 (1969).

Second, appellee's loss of hair was a compensable item of damages, as the court's charge to the jury recognized (N.T. 266-267). Therefore, appellant's contention that the photographs, which depicted the condition of appellee's hair before the permanent wave, were "immaterial," is incorrect.

### III

As an appellate court, we are hesitant to overturn a damage award assailed as excessive. As we recently repeated in *Simmons v. Mullen*, 231 Pa. Superior Ct. 199, 214, 331 A.2d 892, 901 (1974): ". . . an appellate court should be exceedingly reluctant to interfere with a verdict found by the lower court not to be excessive [citation omitted]. Thus we have said that we shall not find a verdict excessive unless it is so grossly excessive that it shocks our sense of justice." [citations omitted].

Judged by this standard, the jury's verdict of $27,000.00 in this case was not excessive. In addition to pain, which she characterized as "overwhelming" (N.T. 51), appellee suffered a large amount of hair loss, and felt a burning sensation in her scalp, which persisted to the time of trial. (N.T. 52) Because extremes of hot and

cold exacerbate the pain, appellee is unable to do any gardening or to enter a hot car. (N.T. 38) In addition, appellee suffered humiliation and embarrassment as a result of the permanent wave. She was forced to wear a wig to hide the hair damage, even though she "detest[s] wigs." (N.T. 40) She was ashamed to show her damaged scalp to any members of her family, especially her grand-children. (N.T. 39) The wig she used to hide her condition caused her to suffer a burning and itching sensation during the hot weather; appellee frequently had to rinse the wig in cold water (N.T. 40). Appellee's injuries have interfered with her sleep, and she has used sleeping pills for the first time in her life (N.T. 39). She has had to curtail her social activities because of her injuries (N.T. 39).

In light of these facts, we cannot say that the jury acted excessively in assigning the dollar figure it did to appellee's injuries.

Affirmed.