J. A25007/16

**NON-PRECEDENTIAL DECISION -- SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| MARK W. SCHWALM, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| RUPEN G. MODI, D.O., | : | |
| HOLY SPIRIT HOSPITAL OF THE | : | |
| SISTERS OF CHRISTIAN CHARITY, | : | No. 145 MDA 2016 |
| AND NEW JERSEY/PENNSYLVANIA | : | |
| EM-I MEDICAL SERVICES, P.C. | : | |

Appeal from the Judgment Entered January 7, 2016,
in the Court of Common Pleas of Cumberland County
Civil Division at No. 2013-03739

BEFORE:  FORD ELLIOTT, P.J.E., SHOGAN, J., AND STEVENS, P.J.E.*

MEMORANDUM BY FORD ELLIOTT, P.J.E.:　　　**FILED DECEMBER 22, 2016**

Mark W. Schwalm appeals from the judgment entered January 7, 2016 for defendants/appellees in this medical malpractice action.  After careful review, we affirm.

The trial court has aptly summarized the facts of this matter as follows:

> We will start with a recitation of the facts in the light most favorable to [appellees] as the verdict winner.  [Appellant]'s girlfriend [(Leslie Shenk)] testified at trial that he was more quiet than usual and did not seem himself on the evening of April 7, 2012.  On the morning of April 8, 2012, they got out of bed at approximately 10:00 a.m.  While the

---

* Former Justice specially assigned to the Superior Court.

girlfriend was in the kitchen making coffee, [appellant] was in the bathroom changing his clothes. He testified that as he picked up his overnight bag, he "felt like a warmth and like the breath went out of [him]." When he came into the living room, his girlfriend saw him struggle to pick up a picture that had been knocked over. Minutes later, she noticed that he was struggling to drink his coffee. They went directly to the emergency room at Holy Spirit Hospital.

At approximately 11:30 a.m. [appellant] arrived at the hospital. Dr. [Rupen G.] Modi[, D.O.,] examined him immediately upon arrival. [Appellant] reported that the left side of his face was drooping and weak and that he had had some difficulty drinking his coffee earlier that morning. He did not report any difficulty standing, walking, or additional weakness.[Footnote 13] [Dr. Modi] took a history of [appellant]'s symptoms and conducted both physical and neurological examinations. Dr. Modi recorded sudden onset of symptoms as thirty minutes prior.

[Footnote 13] [Appellant] did not tell anyone at the emergency department about him struggling to pick up a picture frame.

A few moments later at 11:40 a.m., the triage nurse met with [appellant]. She recorded that [appellant] awoke at 10:00 a.m. with symptoms and had a loss of sensation in his left arm. After reviewing the nurse's note, [Dr. Modi] returned to examine [appellant]'s left arm. Upon examination, [appellant] reported that the sensation in both arms was the same and withdrew his complaint concerning his left arm.

[Dr. Modi] concluded that the "most reasonable diagnosis" for [appellant]'s symptoms was Bell's palsy. The third most common cause of Bell's palsy is Lyme disease. [Appellant] reported to [Dr. Modi] that he had removed a deer tick from his abdomen approximately ten days prior. A key factor

in [Dr. Modi]'s diagnosis of Bell's palsy was the involvement of the left side of [appellant]'s forehead in his facial paralysis.[Footnote 23]

> [Footnote 23] [Appellant] could not raise his left eyebrow during the physical examination. The jury heard testimony that a stroke would allow continuing function of the forehead whereas a lesion of the facial nerve (Bell's palsy) would cut off nerve supply to both the upper and lower face, leaving the forehead paralyzed.

Before [appellant]'s discharge, [Dr. Modi] held a fifteen-minute conversation with [appellant] and his girlfriend regarding the differences between Bell's palsy and stroke. [Dr. Modi] also discussed instructions for [appellant] should his symptoms change or worsen.

After his discharge, [appellant] drove without incident from Camp Hill to his residence in Tower City, a distance of approximately 38 miles. He was examined the following morning by his family doctor who also diagnosed Bell's palsy. Two days later [appellant] underwent a brain MRI, which revealed that he had, in fact, suffered a stroke.[Footnote 28] He was immediately admitted to the hospital.

> [Footnote 28] There is no dispute among the parties that [appellant]'s stroke occurred prior to [Dr. Modi]'s treatment of [appellant] on April 8, 2012.

Trial court opinion, 4/7/16 at 2-3 (citations to the transcript omitted) (some footnotes omitted).[1]

---

[1] Appellant accepts the factual and procedural history of the case as set forth in the trial court's Pa.R.A.P. 1925(a) opinion. (Appellant's brief at 6.)

[Appellant] filed this medical malpractice action as a result of his treatment at the Emergency Department of Holy Spirit Hospital on the morning of April 8, 2012.  He alleged that Defendant Dr. Rupe[n] Modi was negligent in failing to diagnose that he had suffered a stroke.  He contended that had he been correctly diagnosed, he would have received tPA[2] treatment which could have greatly limited the adverse effects of his stroke.  A jury found that Dr. Modi was not negligent in his care and treatment of [appellant].[Footnote 1]  [Appellant] filed a Motion for Post-Trial Relief which we denied on December 22, 2015.

[Footnote 1] The jury did not reach the issues of causation and damages or whether [Dr. Modi] was an agent of Defendant Holy Spirit Hospital.

*Id.* at 1.

This timely appeal followed.  Appellant complied with Pa.R.A.P. 1925(b), and the trial court filed a Rule 1925(a) opinion.[3]

---

[2] Tissue plasminogen activator ("tPA") is a thrombolytic (a "clot-busting" drug) to break up blood clots.

[3] The trial court noted that appellant's Rule 1925(b) statement was 22 pages long with 5 pages of exhibits.  (Trial court opinion, 4/7/16 at 1 n.2.)  The trial court characterized it as "neither concise nor particularly helpful."  (*Id.*)  We caution appellant that filing an unnecessarily voluminous Rule 1925(b) statement can result in waiver.  ***Jiricko v. Geico Ins. Co.***, 947 A.2d 206, 210-214 (Pa.Super. 2008), ***appeal denied***, 958 A.2d 1048 (Pa. 2008) (finding waiver where the appellant's statement "reveals a deliberate attempt to circumvent the meaning and purpose of Rule 1925(b) and to overwhelm the court system").  Here, however, there is no evidence of bad faith and all of appellant's allegations of error relate to the testimony of appellees' experts, Dr. James Jaffe and Dr. James Gebel.  (Trial court opinion, 4/7/16 at 1.)  The trial court did address these issues in a Rule 1925(a) opinion.  Therefore, we will not find appellant's issues waived on appeal.  ***See Eiser v. Brown & Williamson Tobacco Corp.***, 938 A.2d 417

- 4 -

Appellant has raised the following issues for this court's review:

A. Did the trial court commit judicial error and/or abuse its discretion in denying [appellant]'s motion in limine and objections at trial in permitting defendant's expert, Dr. Gebel, to testify beyond his role as an independent medical consultant performing an independent medical examination contrary to Pa.R.C.P. 4010 and testifying as an expert beyond his qualifications, and contrary to Pa.R.Evid. 702, 703, 704, and 705?

B. Did the trial court err and abuse its discretion in denying [appellant]'s motion in limine and objections at trial in permitting Dr. Jaffe to testify beyond the scope of his qualifications and contrary to Pa.R.Evid. 702, 703, 704 and 705?

C. Did the trial court commit judicial error and abuse its discretion in permitting Doctors Gebel and Jaffe to testify as to the standard of care of an emergency room physician when neither was qualified as an emergency room physician and contrary to the order of the court that neither would testify as to the standard of care of an emergency room physician?

Appellant's brief at 4 (capitalization deleted).

"[W]hen reviewing the denial of a motion for new trial, we must determine if the trial court committed an abuse of discretion or error of law that controlled the outcome of the case." *Estate of Hicks v. Dana Companies, LLC*, 984 A.2d 943, 951 (Pa.Super. 2009) (*en banc*), *appeal*

---

(Pa. 2007) (plurality) (waiver based on the number of issues raised is inappropriate in the absence of bad faith).

*denied*, 19 A.3d 1051 (Pa. 2011) (citations omitted).

> Admission of evidence is within the sound discretion of the trial court and we review the trial court's determinations regarding the admissibility of evidence for an abuse of discretion. To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party.

*Id.* at 961 (citations omitted). "Additionally, [e]videntiary rulings which did not affect the verdict will not provide a basis for disturbing the jury's judgment." *Id.* (internal quotation marks and citations omitted) (brackets in original).

Since all of appellant's issues on appeal concern the expert testimony of Dr. Gebel and Dr. Jaffe, we will briefly summarize their testimony. James Jaffe, M.D., testified via videotaped deposition on July 10, 2014. Dr. Jaffe is a board-certified neurointerventional radiologist. (Notes of testimony, 7/10/14 at 6, 8.) Dr. Jaffe currently practices at Holy Cross Hospital in Silver Spring, Maryland. (*Id.* at 9.) As part of his practice, he assesses emergency room patients suspected of having a stroke. (*Id.* at 7.) Dr. Jaffe is consulted regarding whether or not patients have had or are having a stroke, what type of stroke (ischemic or hemorrhagic), and whether they are eligible for catheter-based therapies, including tPA therapy. (*Id.*)

Dr. Jaffe reviewed numerous records, including appellant's hospital records, the records of his primary care physician, Dr. Edward Lentz, and appellant's deposition testimony. (*Id.* at 37-38.) According to Dr. Jaffe,

even if appellant had been diagnosed as having a stroke, he would not have been a candidate for tPA therapy due to the uncertain time of onset of the condition. (**Id.** at 41.) Dr. Jaffe characterized appellant's stroke as a "wake-up stroke":

> From the record of Holy Spirit Hospital, it states that the patient awoke with symptoms. So, to me, that's a wake-up stroke. We don't know the exact timing of the stroke. Time is brain. It could have occurred anywhere from the time he went to sleep.
>
> Q[.]  And why is that important?
>
> A[.]  Because studies have shown if tPA is given after four and a half hours of the onset of stroke, it actually causes more harm to patients than benefit.

**Id.** at 46.

Dr. Jaffe characterized this case as "very confusing" as to the onset of appellant's symptoms:

> Well, I think, as we have demonstrated here, that this is a very confusing case with confusing timing as to onset of symptoms. As I read through the depositions, there is [sic] multiple different times of symptoms, multiple different times of when symptoms are reported. In the actual medical record, which we have to take as fact, it says the patient awoke with symptoms. That means, to me as a physician taking care of stroke patients, there is no exact timing of when the stroke began. If you have no exact timing of when the stroke began, you have to try to get witnesses to tell you when the last time the patient was witnessed as normal. As far as I can see from the records and fact, that was at midnight on, whether you want to say April 7th or April 8th, 2012. Also in the record of deposition of Ms. Shenk, she said he wasn't feeling very well. He

wasn't quite himself. And my practice of patients I've seen, one of the early signs of stroke that I hear from family members, loved ones, is that they weren't feeling quite right, they weren't themselves. And that can be very confusing with stroke. Stroke is a very confusing diagnosis to make. A lot of patients come in to the emergency rooms that I've seen, when I've been in the emergency room, who have been diagnosed as psychotic. They later turn out to have a stroke. They weren't feeling quite right. It can be one of the signs of stroke. So, when I look at the record and the records, in fact, that possibly the stroke began the evening before. But as far as I can tell from the medical record that's written, is that he awoke with stroke, so, there is no exact timing. I think the other fact that comes in here is that there weren't hard and fast stroke symptoms. There was another diagnosis that explained what he was having, so that the physician who is taking care of him, from the record, thought in his best medical opinion that it was reasonable that this gentleman was not having a stroke, but was suffering from Bell's palsy, of which IV tPA will have no benefit, will only cause harm.

*Id.* at 54-55.

Dr. Jaffe testified that before tPA therapy can be administered, it must be certain that the patient is actually having a stroke:

> Q[.] Now, is it fair to say that before any patient is given tPA or a catheter-based treatment for an acute stroke that you essentially have to be sure that the patient is having a stroke?
>
> A[.] Absolutely. Any of these therapies, whether it's IV [(intravenous)] tPA, IA [(intra-arterial)] tPA or the catheters I use to remove clots, they can have devastating complications that can make a stroke patient worse than his natural history of stroke.

Q[.] Can you explain what you mean by that in further detail, please?

A[.] IV tPA, for example, can cause a brain hemorrhage, which can kill a patient. The catheters that we use to remove clots can kill a patient. And some instances, again, some of these methodologies, if used improperly, will cause more harm to a patient than benefit.

*Id.* at 59. Dr. Jaffe also testified that even among those stroke patients who received IV tPA within the 4½ hour time window, 89% showed no benefit over their natural stroke history. (*Id.* at 59-60.)

On cross-examination, Dr. Jaffe was questioned regarding appellant's statement that he woke up at 9:00 a.m. and used the bathroom without symptoms. (*Id.* at 68.) Dr. Jaffe explained that appellant could have used the bathroom at 9:00 a.m. or even brushed his teeth when he got up again at 10:00 a.m. while having a stroke:

I recognize that patients who have strokes a lot of times don't recognize they're having strokes. And just like now, he might not have and the first time the girlfriend recognized it, because he was dropping things. A lot of times we wake up in bed, we sit there in bed, we don't necessarily do any activity and yet we have had a stroke and we fall back to sleep again. So, I didn't disregard that, but that doesn't mean anything to me. It doesn't mean he didn't already have a stroke.

*Id.* at 68.

My point is, is that he didn't have any motor weakness. I would expect him to be able to brush his teeth. I would expect him to be able to go to the bathroom. As we saw, even when he went to Holy Spirit, he still was not having any motor weakness.

> That doesn't mean his stroke wasn't started before that, nor does it mean his stroke didn't happen at 9:00 when he woke up.

*Id.* at 70.

James M. Gebel, Jr., M.D., testified at trial on July 18, 2014. Dr. Gebel is a stroke neurologist and is currently the chair of neurology at Akron General Medical Center in Akron, Ohio. (Notes of testimony, 7/18/14 at 5.) Dr. Gebel performed an independent medical examination ("IME") of appellant and also prepared an expert report. (*Id.* at 8-11.) As did Dr. Jaffe, Dr. Gebel testified that due to the uncertainty of the onset of appellant's symptoms, he would not have been a viable candidate for tPA therapy:

> Q[.] Doctor, having reviewed these materials, have you been able to identify precisely when Mr. Schwalm's onset of symptoms -- can you give me a timeframe for that?
>
> A[.] Again, sir, I don't know how I can. I mean, I think if we take what his girlfriend is saying about -- you know, she uses exactly the same phraseology, as I recall, in the e-mail about the evening before versus the same day. If that is what she observed, and if, in fact, that is correct, I think that is a plausible -- you know, the most plausible timeframe for it starting. If what Mr. Schwalm told me, which is that he woke up at 9:00, went to urinate, was completely fine and asymptomatic and had no problems, spoke to his girlfriend, and then an hour later woke up with the symptoms, then I'd have to place the onset at 9 a.m. If I take what the neurologist who saw him said, which is that he woke up, and as soon as he got up started getting dressed and had trouble

dressing, then, again, we're back to the day before or the night before when he went to bed. I think my problem is -- and then Dr. Modi has another history. The triage nurse has a different history, saying he had numbness in his face as opposed to trouble dressing. As an expert, I don't know which one I can say with certainty is the correct one. I think part of the problem with this case, quite frankly, is we've got literally five or six different renditions of what transpired, which, of course, makes it very difficult to pin down an exact time the stroke began and what the exact symptoms were because we have conflicting information.

Q[.] How does an inability to identify the onset of the symptoms impact a patient's candidacy for IV tPA?

A[.] Well, you have to have either one of two things. You either have to witness, you know, and know for sure the moment the symptoms begin, which this is called a witness onset, and that's the time that you take. You have a maximum of either three or four and a half hours to give the medication, depending on the particular person's circumstances, so that's when the sort of clock, if you will, starts to tick. When it's an unwitnessed onset of stroke symptoms, then you have to take the time that the person was last definitely known to be well as opposed to the first time they were found to be unwell.

*Id.* at 32-33.

Dr. Gebel also testified that tPA therapy can be dangerous if administered to a patient who is not having a stroke:

Q[.] Doctor, the jury has heard from a number of witnesses that you need to have a confirmed diagnosis of a stroke and you need a confirmed

onset of symptoms for giving intravenous tPA. Are those rules or guidelines that you subscribe to?

A[.] Oh, certainly. I mean, if you're not sure the person is having a stroke, you don't want to give them tPA, because it has a 6.4 percent chance of causing hemorrhaging in the brain, serious hemorrhaging that causes damage and symptoms, if it's given within three hours. Then if it's given within the three to four and a half hours, what we call the bonus or extended time window, that number goes up to 8.9 percent. You can't take a medication that has a 6 to 9 percent chance of causing hemorrhaging in the brain and give it to someone unless you're pretty darn sure they're having a stroke. If you think someone is having a seizure or some other condition or you're not sure or you're not sure when the stroke began, you know, you don't want to give it. Again, the sooner you give it the better it works. It's a lot better if you give it within three hours than if you get past three hours and you're getting out to that four and a half hour timeframe.

*Id.* at 35-36.

We now turn to appellant's arguments on appeal. First, appellant contends that the trial court erred by allowing Dr. Jaffe and Dr. Gebel to testify that appellant suffered a "wake-up stroke" without providing the specific references required under Pennsylvania Rules of Evidence 702, 703, 704, and 705. (Appellant's brief at 16.) According to appellant, Dr. Modi's failure to consult with a neurologist or the stroke team resulted in "pure speculation" as to whether or not appellant would have received tPA therapy. (*Id.* at 16-17.)

- 12 -

Rules 702 through 705, upon which appellant relies, provide as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;
>
> (b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and
>
> (c) the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 702.

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.

Pa.R.E. 703.

> An opinion is not objectionable just because it embraces an ultimate issue.

Pa.R.E. 704.

> If an expert states an opinion the expert must state the facts or data on which the opinion is based.

Pa.R.E. 705.

> Accordingly, **Kozak** [**v. Struth**, 531 A.2d 420 (Pa. 1987),] requires disclosure of the facts used by the expert in forming an opinion. The disclosure can be

> accomplished in several ways. One way is to ask the expert to assume the truth of testimony the expert has heard or read. ***Kroeger Co. v. W.C.A.B.***, 101 Pa. Cmwlth. 629, 516 A.2d 1335 (1986); ***Tobash v. Jones***, 419 Pa. 205, 213 A.2d 588 (1965). Another option is to pose a hypothetical question to the expert. ***Dietrich v. J.I. Case Co.***, 390 Pa. Super. 475, 568 A.2d 1272 (1990); ***Hussey v. May Department Stores, Inc.***, 238 Pa. Super. 431, 357 A.2d 635 (1976).

***Id.***, Comment.

As detailed above, the evidence as to the onset of appellant's symptoms was conflicting and confusing, at best. However, there was evidence to support the conclusion that appellant suffered a "wake-up stroke," including the neurologist's history that as soon as appellant woke up he had trouble getting dressed and his girlfriend's statement that he was not acting like himself the evening prior. It is true, as appellant points out, that there was contrary evidence that his symptoms did not begin until after he awoke at 10:00 a.m. and tried to pick up a photograph off the floor. However, as Dr. Jaffe testified, the fact that it was impossible to pinpoint precisely when appellant's symptoms began meant that he was not a candidate for tPA:

> I think nothing's real exact in this case and I think that's the whole problem with this case and why he wasn't a good candidate for IV tPA. There is [sic] all sorts of symptoms all over the place. There is [sic] all sorts of different times waking up. There is [sic] all sorts of things the night before. There is [sic] different timings in all these records, which does happen in the medical record, unfortunately, but I think this builds towards my opinion, as a reasonable

> physician, that there is no way to exactly time what's going on here.

Notes of testimony, 7/10/14 at 79.

The defense experts' opinions were based on the medical records and were not "pure speculation" as appellant suggests; rather, they testified that even if Dr. Modi had correctly diagnosed an ischemic stroke, appellant would not have received tPA therapy because it was impossible to determine the onset of his symptoms. If appellant's stroke began the night before, as suggested by his girlfriend, or he had suffered a stroke sometime during the night, tPA therapy would have been ineffective and perhaps even dangerous. Furthermore, both Dr. Jaffe and Dr. Gebel were causation experts. They were not called to testify on the standard of care. The jury never reached the issue of causation because they found Dr. Modi was non-negligent.

Next, appellant claims that the trial court erred by allowing Dr. Gebel to be "converted" from a Pa.R.C.P. 4010 IME expert into a Pa.R.C.P. 4003.5 liability expert. (Appellant's brief at 17.) According to appellant, an IME is limited to the issue of damages and there is no case law permitting a Rule 4010 damages expert to testify as a Rule 4003.5 liability expert. (*Id.* at 20-24.)

Rule 4010 provides, in relevant part, as follows:

> (a)(1)    As used in this rule, "examiner" means a licensed physician, licensed dentist or licensed psychologist.

(2) When the mental or physical condition of a party, or of a person in the custody or under the legal control of a party, is in controversy, the court in which the action is pending may order the party to submit to a physical or mental examination by an examiner or to produce for examination the person in the party's custody or legal control.

(3) The order may be made only on motion for good cause shown and upon notice to the person to be examined and to all parties and shall specify the time, place, manner, conditions and scope of the examination and the person or persons by whom it is to be made.

(4)(i) The person to be examined shall have the right to have counsel or other representative present during the examination. The examiner's oral interrogation of the person to be examined shall be limited to matters specifically relevant to the scope of the examination.

Note: Ordinarily, the facts giving rise to liability are not germane to an examination and the information which the examiner seeks should be limited to facts of liability germane to the issue of damages.

Pa.R.C.P. 4010.

Rule 4003.5 provides, in relevant part, as follows:

(a)  Discovery of facts known and opinions held by an expert, otherwise discoverable under the provisions of Rule 4003.1 and acquired or developed in anticipation of litigation or for trial, may be obtained as follows:

(1)  A party may through interrogatories require

(A)  any other party to identify each person whom the other party expects to call as an expert witness at trial and to state the subject matter on which the expert is expected to testify and

(B)  subject to the provisions of subdivision (a)(4), the other party to have each expert so identified state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion. The party answering the interrogatories may file as his or her answer a report of the expert or have the interrogatories answered by the expert. The answer or separate report shall be signed by the expert.

(3)  A party may not discover facts known or opinions held by an expert who has been retained or specially employed by another

party in anticipation of litigation or preparation for trial and who is not expected to be called as a witness at trial, except a medical expert as provided in Rule 4010(b) or except on order of court as to any other expert upon a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means, subject to such restrictions as to scope and such provisions concerning fees and expenses as the court may deem appropriate.

(c)   To the extent that the facts known or opinions held by an expert have been developed in discovery proceedings under subdivision (a)(1) or (2) of this rule, the direct testimony of the expert at the trial may not be inconsistent with or go beyond the fair scope of his or her testimony in the discovery proceedings as set forth in the deposition, answer to an interrogatory, separate report, or supplement thereto. However, the expert shall not be prevented from testifying as to facts or opinions on matters on which the expert has not been interrogated in the discovery proceedings.

Pa.R.C.P. 4003.5.

Here, Dr. Gebel testified that he was retained to perform an IME of appellant and also to prepare an expert report pursuant to Rule 4003.5. (Notes of testimony, 7/18/14 at 8.)  Appellant was transported to Ohio for the IME, and Dr. Gebel gave appellant a copy of his notes from the exam. (*Id.* at 9, 11-12.)  It is undisputed that appellant was also provided with a

copy of Dr. Gebel's May 16, 2014 expert report as required by Rule 4003.5 and that he testified consistently with that report. While it is true that the purpose of an IME is to assess damages, appellant cites no case law for the proposition that an IME expert is precluded from also testifying as to liability. There is nothing to suggest that Rules 4010 and 4003.5 are mutually exclusive. This claim fails. The trial court did not err in permitting Dr. Gebel to testify as to both causation and damages, consistent with his report.[4]

Next, appellant argues that Dr. Gebel failed to comply with Rules 702 through 705 and that defense counsel should have used hypothetical questions. (Appellant's brief at 25.) According to appellant, Dr. Gebel's opinion testimony was based upon "speculation" that appellant was having a stroke the night before he reported to the ER. (*Id.* at 26.) Appellant contends that what the stroke team may or may not have done had Dr. Modi correctly diagnosed a stroke is speculation. (*Id.*)

While Rule 705 permits the use of hypothetical questions, they are not required. Pa.R.E. 705, Comment. All that is required is that the expert disclose the facts used in forming his or her opinion. *Id.* Here, Dr. Gebel based his opinion on all of the medical records and the testimony, including Ms. Shenk's statement that appellant was not acting normally the night before and the Pinnacle Health neurologist's report that when he woke up

---

[4] Again, we note that the jury never reached the issues of causation or damages, since they found Dr. Modi was not negligent.

the next morning, appellant had difficulty getting dressed. Dr. Gebel testified that in his expert opinion, appellant would not have been a good candidate for IV tPA therapy based on the uncertainty of when the stroke began. Therefore, Dr. Gebel's testimony was not based on mere "speculation" as appellant contends.

Appellant also argues that Dr. Gebel gave standard of care testimony in violation of the pre-trial agreement and that Dr. Gebel's opinion ignored undisputed evidence that appellant's symptoms did not manifest themselves until 10:15 a.m. on April 8, 2012. (Appellant's brief at 27-31.) Dr. Gebel did not give standard of care testimony. He and Dr. Jaffe were called solely to provide testimony on the issues of causation and damages. (Trial court opinion, 4/7/16 at 5-6.) In fact, appellant opened the door to standard of care testimony during his cross-examination of Dr. Gebel:

> Q[.] If we now turn to table 9. Is this what an emergency room is supposed to do?
>
> A[.] Well, again, this is -- if you're suspecting someone is having an acute ischemic stroke -- that's the kind, again, where a clot cuts off circulation to the brain as opposed to a hemorrhage in the brain -- these are the tests that are recommended for patients with a suspected acute, meaning recent, ischemic stroke, yes, sir.
>
> Q[.] Let's start at the top.
>
> A[.] Sure.
>
> MR. CHAIRS: Judge, I would like to object at this point. He asked specifically is this what an

emergency room is supposed to do. Dr. Gebel has been very clear with the Court that he is not here to testify to standards of care.

MR. ANGINO: My gosh, he has testified completely as to this being not a candidate for tPA. This is exactly in that area.

THE COURT: All right. I'll overrule the objection, but that opens it up for redirect.

MR. ANGINO: Absolutely.

Notes of testimony, 7/18/14 at 49-50.

Furthermore, contrary to appellant's argument on appeal, there was not an undisputed "witness onset" time of 10:15 a.m. (Appellant's brief at 31.) Ms. Shenk indicated that appellant's symptoms could have begun as early as the evening of April 7, 2012. Appellant told the neurologist on April 12, 2012, that he woke up on April 8th with symptoms including difficulty getting dressed and facial numbness. As thoroughly set forth above, Dr. Gebel and Dr. Jaffe testified that, given the conflicting evidence as to timing of onset of appellant's symptoms, it was impossible to pinpoint with any certainty when appellant's stroke began. Therefore, appellant was not a candidate for tPA catheter-based therapy, even if Dr. Modi had diagnosed a stroke as opposed to Bell's palsy. These opinions were based on the evidence of record. Dr. Gebel and Dr. Jaffe were not required to accept testimony that appellant's symptoms began at 10:15 a.m. when he attempted to pick up the photograph and had difficulty drinking his coffee,

when other evidence indicated that appellant's symptoms began earlier, perhaps even the previous evening.

Finally, appellant argues that Dr. Jaffe was permitted to give emergency room standard of care testimony in violation of a pre-trial order and that he violated Rule 705 by testifying from the "totality" of the evidence where the evidence was in conflict. (Appellant's brief at 32-40.)

The trial court granted appellant's motion *in limine* to limit Dr. Jaffe's testimony to a discussion of diagnosis of stroke, the use and efficacy of tPA therapy, and whether appellant would have been a candidate for tPA or other catheter-based therapy for an acute stroke. (Trial court opinion, 4/7/16 at 6.) Dr. Jaffe is not an emergency room physician and did not testify regarding the standard of care for an emergency room physician. (*Id.*) Appellant points to Dr. Jaffe's testimony that in his opinion as a physician who cares for stroke patients, Dr. Modi did a complete neurological examination and acted in a medically reasonable fashion. (Notes of testimony, 7/10/14 at 63-64.) However, as explained by the trial court, "The statement . . . refers to the standard of care applicable to physicians responsible for the diagnosis of stroke. Dr. Jaffe's experience treating stroke patients every day qualified him to testify to the standard of care which is observed by physicians diagnosing stroke." (Trial court opinion, 4/7/16 at 6,

n.45.) Dr. Jaffe did not violate the pre-trial motion *in limine* by testifying to the standard of care for an emergency room physician.[5]

Appellant also argues that under Rule 705 and *Kozak*, an expert witness must provide the case-specific factual basis for his or her opinion, and cannot endorse a particular version of contradictory evidence, which is for the jury. (Appellant's brief at 39-40.)

> For over a century, we have consistently held that an expert's comment on the totality of the evidence, where the evidence is in conflict, improperly impinges upon the jury's exclusive province. In 1885, Mr. Justice Green declared that "[t]he [expert] witness can not be asked to state his opinion upon the whole case, because that necessarily includes the determination of what are the facts, and this can only be done by the jury." *Yardley v. Cuthbertson*, 108 Pa. 395, 450, 1 A. 765, 773 (1885). Following *Yardley*, a litany of decisions have reiterated the principle that an expert cannot weigh contradictory evidence and place his imprimatur upon a particular version. Our general commitment to the sanctity of the jury's role as factfinder was recently re-emphasized in *Commonwealth v. Seese*, 512 Pa. 439, 517 A.2d 920 (1986).

*Kozak*, 531 A.2d at 422-423 (additional citations omitted).

Appellant simply repeats many of the same arguments made with respect to Dr. Gebel. Again, Dr. Jaffe's testimony indicates that he did not adopt any particular version of competing evidence. Indeed, the whole point

---

[5] We also note that David J. Karras, M.D., Dr. Modi's standard of care expert, testified that Dr. Modi met the standard of care for an emergency room physician. (*Id.* at 8.) The jury apparently agreed, since they did not reach the issues of causation and damages.

was that with all of the contradictory versions of when appellant first exhibited symptoms of a stroke, it would be impossible to determine the time of onset which would exclude appellant as a candidate for tPA therapy. Dr. Jaffe testified on cross-examination when questioned regarding Ms. Shenk's statement that appellant was having trouble drinking his coffee on the morning of April 8, 2012, followed by left-sided facial weakness and slurring of his speech, as follows:

> And this is exactly what I'm saying. Is that, sometimes histories can be extremely inaccurate and people get mixed things from different people. They don't always get the accurate history. And that's the whole problem with giving IV tPA. It seems like everything here is a bit of a mishmash. I, as a physician, evaluating this see a lot of different stories and I don't know exactly what's going on here. I don't know the exact timing of this. The symptoms are somewhat vague. And I've got to be honest with you, this is why people don't give IV tPA.

Notes of testimony, 7/10/14 at 78-79. On redirect, Dr. Jaffe testified that the nursing triage note from Holy Spirit, indicating that appellant awoke that morning at 10 a.m. with numbness in the left side of his face, as well as the neurologist's report from Pinnacle Health, which stated that appellant woke up on April 8th with numbness in his left upper extremity, difficulty getting dressed, facial numbness and drooling out of the left side of his mouth, were consistent with his opinion that, at best, appellant suffered a "wake-up stroke" which would rule out tPA therapy. (*Id.* at 83-86.) As such, this is a case where the contradictory nature of all the evidence supports the expert's

opinion regarding lack of causation. Appellees' experts did not have to accept any particular version of conflicting evidence in order to render an opinion. The fact that appellant disagreed with their conclusions did not make them inadmissible.

For these reasons, we determine that the trial court did not err in denying appellant's motion for a new trial.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/22/2016